## VICKERY v. YAHOLA SAND & GRAVEL CO. (STATE ex rel. COM'RS OF LAND OFFICE, Intervener).

No. 20592. Opinion Filed June 28, 1932.

Thomas F. Shea, for plaintiff in error.

R. H. Couch, J. L. Carpenter, and Haskell Paul, for intervener.

RILEY, J. This is an appeal from a judgment of the district court of Muskogee county in an action wherein the plaintiff in error, a Cherokee allottee, was plaintiff. As his distributive share of the lands of the Cherokee Tribe he received an allotment abutting upon the Arkansas river, on the left or north bank thereof, a short distance below its confluence with the Grand river. It is alleged that the Yahola Sand & Gravel Company removed large quantities of sand and gravel from the bed of the Arkansas river at a point where it flows along plaintiff's allotment, and this suit was brought to recover for the sand and gravel so taken.

The plaintiff contends that his title extends to the thread or middle of the main channel of the Arkansas river. He con-

cedes, and did so at the trial, that the river is navigable at that point. The cause was, by agreement, tried to the court without a jury. The trial court found for the defendant, and plaintiff appeals.

After the appeal was perfected, the state of Oklahoma, on relation of the Commissioners of the Land Office, intervened, with leave of court, and filed an answer brief. The Yahola Sand & Gravel Company filed no briefs.

It is conceded that the sole question involved is whether plaintiff or the state of Oklahoma is the owner of the bed of the Arkansas river between the high water mark on the left or north bank and the thread or middle of the main channel or the river.

It has been held by the court that the state of Oklahoma is the owner of the bed of the Arkansas river throughout its entire course through Oklahoma. State v. Nolegs, 40 Okla. 479, 139 P. 943. It was there held that the Supreme Court takes judicial notice "that the Arkansas river is navigable through its course in the state of Oklahoma." The first paragraph of the syllabus in that case reads:

"The ownership of the navigable waters and the soil under them in all the territory embraced in the Louisiana Purchase was held in trust by the federal government, and as each of the states was created, the same, within the boundaries of such state, passed to it, and the absolute right to such navigable waters and the soil thereunder is in the state, subject to the public rights and the paramount power of Congress over navigation."

It is contended that the decision in the Nolegs Case is no longer the law in Oklahoma. That the same question was involved in United States v. Brewer-Elliott Oil & Gas Co., in the District Court for the Western District of Oklahoma, 249 Fed. 609, affirmed by the U. S. Circuit Court of Appeals, Brewer-Elliott Oil & Gas Co. v. U. S., 207 Fed. 100, and by the Supreme Court of the United States, 260 U. S. 77, and in subsequent cases, wherein the federal courts refused to follow the Nolegs Case.

This is undoubtedly true as to the holding that the court takes judicial notice that the Arkansas river is navigable through its course in Oklahoma.

In the Brewer-Elliott Case, supra, Judge Cotteral, in the district court, held:

"The issue of the navigability of a stream is one of fact, and when used or susceptible of use in its ordinary condition as a highway of trade and travel in the customary modes on water, a stream will be deemed 'navigable.'

"While recognizing the importance of harmony in judicial decisions, the federal courts on questions of general law are not bound by the decisions of the state courts, though leaning to agreement with the state courts, if the question is doubtful.

"While courts should take judicial notice that an important river is navigable, the point where navigability ceases, unless within general knowledge, requires proof, and the federal courts will not take judicial notice that the Arkansas river is navigable above the mouth of the Grand river."

But he also held:

"A state takes title to the bed of navigable streams in its borders, and, subject to the paramount authority of Congress to control navigation in the regulating of interstate and foreign commerce, may appropriate and dispose of minerals found in the beds of such streams."

On appeal to the Circuit Court of Appeals, 270 Fed. 100, it was held:

"The test of navigability in fact of a stream is whether in its natural condition it is used or capable of use for the ordinary purposes of trade and travel by water and for carrying to market the products of the country through which it runs."

On appeal from the decree of the Circuit Court of Appeals to the Supreme Court of the United States, 260 U. S. 77, it was held:

"A navigable river is one which is used, or is susceptible of being used in its ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the modes customary on water.

"The evidence in this case affords no ground for rejecting the finding of the two courts below, that the Arkansas river, along the Osage Reservation in Oklahoma, is not, and never has been, a navigable stream.

"A grant of land in the bed of a non-navigable river made by the United States while holding complete sovereignty over the locality including it, cannot be divested by a retroactive rule or declaration of the state subsequently created out of that territory, classifying the river as navigable.

"Such a grant being attacked upon the ground that the river was navigable and its bed not subject to be granted by the United States, the question of navigability is not a local but a federal question. Wear v. Kan., 245 U. S. 154, distinguished. 270 Fed. 100, affirmed'."

In the body of the opinion of the Circuit Court of Appeals, Judge Sanborn, speaking for the court, said:

"The theory of counsel for the state is that if this river is navigable the United States held the title to the bed of the river below high-water mark until the admission

of Oklahoma into the Union in 1907, when that title vested in the state, but that, if it was not navigable, the title to the bed in controversy vested in the Osage Tribe. This theory ignores the grave question whether or not the United States did not by the treaties and grants to which reference has been made vest in the Cherokee Nation in 1838, and thereafter in the Osage Tribe, its successor in interest, the title to this property even if the river was navigable. Shively v. Bowlby, 152 U. S. 1, 48, 58, 14 S. Ct. 548, 38 L. Ed. 331; Alaska Pac. Fisheries v. U. S., 248 U. S. 78, 87, 39 S. Ct. 40, 63 L. Ed. 138; U. S. v. Romaine, 255 Fed. 253, 260, 166 C. C. A. 423, 430; Knight v. U. S. Land Ass'n, 142 U. S. 161, 183, 184, 12 S. Ct. 258, 35 L. Ed. 974."

The Supreme Court of the United States, 260 U. S. at p. 82, said:

"We have no doubt that the title to the river bed is to be determined by the language of the Act of June 5, 1872, and that the meaning of the Cherokee deed is to be interpreted not as if its words stood alone, but in the light of the acts of Congress in pursuance of which it was made, and especially of the Act of 1872, under which the Osages took possession, and which was enough to vest in them good title to the land described therein without the deed of 1883."

Attention is called to the fact that the Act of Congress of June 5, 1872, by its express terms, made the main channel of the Arkansas river the south and west boundary of the tract of land set apart to be conveyed to the Osage Tribe. It is, however, pointed out that the question of the power of Congress to make grants of land below high-water mark of navigable waters in any territory of the United States in certain cases has been upheld and the whole subject clarified in Shively v. Bowlby, 152 U. S. 1, and the following from that case is quoted with approval:

"We cannot doubt, therefore, that Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States hold the territory."

After reviewing the finding of the district court and the Circuit Court of Appeals to the effect that the Arkansas river along the Osage Reservation was not and never had been "navigable" within the adjudged meaning of that term, the Supreme Court said:

"Neither the argument nor the record discloses any ground which can overcome the weight which the findings of two courts must have with us. Washington Securities Co. v. U. S., 234 U. S. 76, 78; Texas & Pacific Ry. Co. v. Louisiana R. R. Commission, 232 U. S. 338; Chicago Junction Ry. Co. v. King, 222 U. S. 224; Dunn v. Lumberman's Credit Association, 209 U. S. 20, 24. It is a natural inference that Congress in its grant to the Osage Indians in 1872, made it extend to the main channel of the river, only because it knew it was not navigable. This would be consistent with its general policy."

It will thus be seen that the final decision in the Brewer-Elliott Case is based upon the title of the Osage Tribe as fixed by the Act of Congress of June 5, 1872, extending the land thus granted to the main channel of the river; that the river at that place was not and never had been navigable, and that the natural inference is that Congress in its grant to the Osages made it extend to the main channel of the river only, because it knew it was not navigable. If the only reason for extending the grant to the main channel of the river was that Congress knew the river was not navigable along the Osage Reservation, then it is likewise a natural inference, in view of the well-known policy of the Congress of the United States, that had the river there been navigable in fact, and this fact had been known to Congress, the grant would not have been made to extend to the main channel.

United States v. Hayes, 20 Fed. (2d) 873, is cited as being a case where the federal court refused to follow the Nolegs Case, supra, but the state of Oklahoma in that case abandoned its claim to the bed of the Arkansas river along the Creek Indian Reservation and the bed of the Cimarron river flowing through the Creek lands, upon the authority of the Brewer-Elliott Case, supra. However, the Hayes Case holds that whatever title the Creek Indian Tribe acquired in and to the bed of the river passed to the individual allottees abutting said streams to the thread of the stream, and that no interest or title was reserved in or retained by the Creek Nation.

It will be observed that the general rule announced in the Nolegs Case, to the effect that the ownership of the navigable waters and the soil under them within the present boundaries of the state of Oklahoma is in the state, and as announced by the district court in the Brewer-Elliott Case, supra, that "a state takes title to the bed of navigable streams in its borders, and subject to the paramount authority of Congress to control navigation in the regulating of interstate and foreign commerce, may appropriate and dispose of minerals found in the bed of such streams," has never been

repudiated or disputed in any of the cases cited, except perhaps to say that Congress had the power before statehood to convey by grant any of such lands, whenever it became necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States holds the territory.

The question then arises, Has Congress exercised the power by the grant of the lands involved to the Cherokee Indian Tribe by the Treaty with the Western Cherokees of May 6, 1828, as supplemented and modified by the Treaty of February 14, 1833, reaffirmed and ratified in the Treaty with the Cherokees at New Echota, Ga., December 29, 1835, whereby the lands on both sides of the Arkansas river, from above the mouth of the Neosho or Grand river to the confluence of the Arkansas and Canadian rivers, was granted to the Cherokees?

The lands here involved were included within the above grant, and as stated above, it is conceded that the Arkansas river where it flows along said land is and was at that time navigable.

The treaties made no specific mention of rivers, navigable or nonnavigable, within the boundaries of the grant. We have pointed out that the federal courts have held that title to the beds of nonnavigable streams passed to the Cherokee Tribe, and to individual allottees of allotments abutting such streams to the thread thereof. In case of the Osages, by specific grant, and to the Cherokees, by the general rules governing conveyances of land containing nonnavigable streams.

In Brewer-Elliott Oil & Gas Co. v. United States, supra, the Supreme Court said:

"It is true that, where the United States has not in any way provided otherwise, the ordinary incidents attaching to a title traced to a patent of the United States under the public land laws may be determined according to local rules; but this is subject to the qualification that the local rules do not impair the efficacy of the grant or the use and enjoyment of the property by the grantee. Thus the right of the riparian owner under such grant may be limited by the law of the state either to high or low water mark or extended to the middle of the stream. Packer v. Bird, 137 U. S. 661, 669."

And:

"In government patents containing no words showing purpose to define riparian rights, the intention to abide the state law is inferred. Mr. Justice Bradley, speaking for the court in Hardin v. Jordan, 140 U. S. 371, 384, said:

" 'In our judgment the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the state in which the lands lie.' "

The treaties and patent made pursuant thereto contain no words showing a purpose to define riparian rights. The intention to abide the state law is therefore inferred.

Nothing in the treaties will be found showing that it was necessary to convey the title to the bed of the Arkansas river, where it was in fact navigable, to the Cherokee Tribe in order to perform an international obligation. Neither is such necessity shown in order to effect the improvement of such lands (within the bed of the river) for the promotion and convenience of commerce with foreign nations and among the several states.

Considering the several Cherokee Treaties, Acts of Congress, and conveyances in the light of the times and circumstances in which they were made, and giving full force to the rule of interpretation set forth in the opinions of the Circuit Court of Appeals in the Brewer-Elliott Case, supra, nothing appears that would make it necessary to convey the bed of the navigable stream to the Cherokee Tribe in order to carry out any public purposes appropriate to the objects for which the United States held the territory embracing the lands granted. The territory embracing the lands was a part of the Louisiana Purchase. The declared purpose of the Louisiana Purchase Treaty with France was that statehood should be ultimately conferred upon the inhabitants of the territory purchased, though this purpose was in a measure departed from in the treaties, in that by article 5, of the Treaty of New Echota, it was provided:

"Article 5. The United States hereby covenant and agree that the lands ceded to the Cherokee Nation in the foregoing article shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any state or territory."

But ultimately the purpose, as originally declared, has been accomplished.

The only other purpose appropriate to the objects for which the United States held the land that has been suggested was to provide a permanent home for the several Indian tribes.

We see nothing in the treaties or acts of Congress, considering the times and cir-

cumstances in which they were made, and the relation between the contracting parties, that would render it necessary to convey the title to the bed of navigable rivers within the lands granted to the Cherokees in order to carry out the purpose of providing a permanent home for the tribe. .

On the other hand, it would appear to the best interests of the tribe in full enjoyment and possession of the home thus provided, that the navigable rivers within the lands should be and remain public highways. The Cherokee Indians were not then extensively engaged in commerce, but rather an agricultural people. Aside from marketing their agricultural products, their trade and commerce consisted largely of barter and trade between themselves and with certain designated and licensed traders permitted to trade within their country. It was highly necessary at that time, for the benefit of the Cherokees as well as other Indian tribes located on adjacent lands, that the navigation of the Arkansas river, as far up its course as the same was navigable, be kept open and free, and for this purpose it would appear far better that the title to the bed of the streams, where navigable, be kept and held in the (United States, for the ultimate use and benefit of the future state, if and when, by the consent of the Cherokee Tribe, a state should be erected embracing the lands so granted to them.

This would be in accord with the general policy of the United States and the theory upon which the Congress of the United States has constantly acted in disposing of the public lands, stated in Shively v. Bowlby, supra, as follows:

"The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high-water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless, in case of some international duty or public exigency, shall be held by the United States in trust for the future states and shall vest in the several states, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older states in regard to such waters and soils within their respective jurisdictions: in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the state, after it shall have become a completely organized community."

We are, therefore, of the opinion that neither by express terms nor by intention of the contracting parties did the title to the bed of the Arkansas river, where the same was navigable in fact, pass from the United States to the Cherokee Nation within the bounds of the tracts of land granted by the United States to said tribe under and by virtue of the treaties mentioned, but that it was retained and held by the United States in trust for the then future state, and that upon admission of the state of Oklahoma to the Union in 1907, the title thereto vested in and became the property of the state of Oklahoma. The Cherokee Tribe having acquired no interest in or title to the bed of the Arkansas river below high-water mark where it flows along the land involved, it follows that plaintiff in error acquired no right, title, or interest in or to the lands within the bed of the river below high-water mark.

The judgment is affirmed.

HEFNER, CULLISON, SWINDALL, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., and CLARK, V. C. J., absent.