ALADDIN PETROLEUM CORP. et al. v. STATE ex rel. COMMISSIONERS OF THE LAND OFFICE et al. OLDHAM et al. v. SAME.

Nos. 32625, 32629.   Feb. 17, 1948.

Rehearing Denied March 30, 1948.

*191 P. 2d 224.*

Monnet, Hayes & Brown, of Oklahoma City, Don Emery, Rayburn L. Foster, R. B. F. Hummer, and D. E. Hodges, all of Bartlesville, McCollum & McCollum, of Pawnee, Keaton, Wells, Johnston & Lytle, of Oklahoma City, E. R. McNeill, of Pawnee, N. E. McNeill, of Tulsa, and Edward Howell, of Oklahoma City, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., J. Walker Field, Asst. Atty. Gen., Walter Marlin, Law and Executive Council of the Commissioners of the Land Office of the State of Oklahoma, all of Oklahoma City; and Nathan Scarritt and E. S. Champlin, both of Enid, for defendants in error.

GIBSON, J. These cases involve title to a portion of the south half of the bed of the Arkansas river in township 23 north, range 3 east, Pawnee county. In each case the State of Oklahoma ex rel. Commissioners of the Land Office of the State of Oklahoma and Champlin Refining Company, its lessee, defendants in error herein, as plaintiffs, instituted action in trial court against plaintiffs in error, defendants below, to quiet title to that portion of the south half of the river bed which lay opposite the riparian lands of the defendants, owners and their lessees. In each case defendants, on cross-appeal, claimed ownership in themselves of such river bed and sought to quiet their title thereto against the plaintiffs, and, in one of the cases, asked an accounting for oil produced from the bed by the plaintiffs. Upon the trials plaintiffs in each case were awarded judgment, and it is therefrom these appeals were taken. The cases involve the same question, and have been consolidated, briefed and argued together, and, for the purpose of review, they will be treated as one case. For convenience the parties, plaintiffs and defendants in the trial court, will be hereinafter referred to as state and defendants, respectively.

A historical review of the title to the land involved is necessary to a clear understanding of the questions involved. In United States v. Champlin Refining Co. et al., 156 Fed. 2d 769, there was involved the title to river bed land in the same vicinity and held under like chain of title as the lands here involved. The historical review there stated is applicable here, and we quote therefrom:

"The United States originally acquired title to the land in suit as part of the Louisiana Purchase. Under treaties of May 6, 1828, February 14, 1833, and December 29, 1835, the United States, by deed dated December 31, 1838, conveyed to the Cherokee Nation a large tract of land on both sides of the bed of the Arkansas River, embracing the south half of the river bed here in suit. By the treaty of July 19, 1866, the Cherokee Nation agreed that the United States might settle friendly Indians upon that part of the Cherokee lands known as the Cherokee Outlet, which embraced the portions of the river bed here in suit. Article

16 of that treaty provided that such lands would be conveyed to the Indians so settled. By treaty of October 28, 1867, a reservation was set aside for the Cheyenne and Arapahoe Indians between the Cimarron and Arkansas Rivers. That reservation embraced the portions of the river bed here in suit. It was expressly extended to the middle of the Arkansas River. The Cheyenne and Arapahoe Indians declined such reservations and relinquished their claim. On June 5, 1872, Congress authorized the Cherokee Nation to convey to the Osage Nation a tract of land described as follows: 'Bounded . . . on the south and west by the north line of the Creek country and the main channel of the Arkansas River, . . .' The conveyance was made. It included the land on the opposite side of the river at approximately the location of the four riparian tracts and title of the Osage Nation to the north half of the river bed was upheld in subsequent litigation between the United States and the State of Oklahoma.

"The land on both sides of the Arkansas River at the location of the portions of the river bed here in suit was first surveyed into sections, townships, and ranges in September, 1872. The survey was approved on September 16, 1872.

"Two of the riparian tracts are in Township 23 North, Range 4 East of the Indian Meridian. These tracts are held in trust for Pawnee Indians. The other two riparian tracts are located in Township 23 North, Range 3 East of the Indian Meridian. These tracts are held in trust for Otoe Indians.

"Under the 1866 treaty with the Cherokees, and pursuant to the Act of March 3, 1881, the Secretary of the Interior designated and assigned for the use and occupation of the Confederated Otoe and Missouria tribes of Indians 'that portion of Tp. 23, N. R. 3 E. lying West of the Arkansas River. . . .' Pursuant to the 1886 treaty with the Cherokees, and in conformity with the Act of March 3, 1883, the Cherokee Nation, on June 14, 1883, conveyed to the United States in trust for the use and benefit of the Otoe and Missouria Indians: 'Fractional township twenty-three (23) North, range three (3) East

of the Indian Meridian; lying and being on the right bank of the Arkansas River, according to a plat of said lands hereto annexed, marked 'A', and made a part of this conveyance' . . . .' "

In addition to what is contained in the quotation, there is the treaty of December 19, 1891, between the Cherokee Nation and the United States whereby there was ceded to the United States all right and claim of the Nation "in and to that part of the Indian Territory bounded on the west by the one hundred degree (100°) of west longitude; on the north by the State of Kansas; and on the east by the ninety-sixth degree (96°) of west longitude", which embraces the area here involved.

The riparian lands herein are particularly described as lots 6 and 7 of section 23 and lot 8 of southwest quarter of section 24, all in said township and range. The defendants claim title under or through trust patents that were executed August 30, 1900, and June 10, 1907, and being prior to the admission of Oklahoma into the Union they occupy, under the law, the same position as would obtain if fee patents for the lands so held had issued prior to statehood (State of Oklahoma v. State of Texas, 258 U. S. 574, 595, 66 L. Ed. 771). In the patents the lands were described as lots which represented legal subdivisions of the upland established by the government survey and as shown on the official plat. Therein there were no express inclusions or exclusions of rights in the river bed.

There are no disputed issues of fact. On the question of navigability, which is involved, the defendants introduced one witness who testified that the Arkansas river at the locality involved was not and never had been navigable, and they stated to the court they were prepared to introduce other witnesses who would testify to the same effect. At this juncture counsel for plaintiffs frankly informed the court they would offer no testimony on the question of navigability and that they rested their claim of navigability on the decision

of this court in State v. Nolegs, 40 Okla. 479, 139 P. 943. It is manifest that the result of the evidence introduced and the statement made is to establish for all of the purposes of this case the nonnavigability of the stream in fact unless by force of the decision in the Nolegs case the stream is to be deemed navigable for the purpose of the issues involved.

As grounds for the alleged error in the judgment the defendants submit the following propositions:

"Proposition One

"After its conveyance to the Cherokee Nation in December, 1838, title to the lands involved herein was never held by the United States of America except as trustee for the use and benefit of the Otoe and Missouria tribes of Indians.

"Proposition Two

"Since the Arkansas River at the locations in controversy was not navigable in fact or in law at the time of Oklahoma's admission to the union, the defendants' predecessors and the defendants, by conveyance, acquired ownership of the land to the middle of the stream."

And, among the authorities cited, chief reliance is placed upon Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 67 L. Ed. 140, and State of Oklahoma v. State of Texas, supra, which are urged to be in point and controlling.

The contention of the state in support of the judgment is thus stated in the brief:

"That all portions of the river bed which were expressly granted to Indian tribes, prior to Statehood, remain the property of those tribes or their grantees, whereas all portions of the bed which were not thus conveyed, but which were a part of the public domain, became the property of the State of Oklahoma by virtue of the rule of property announced and declared by this court in State v. Nolegs, 40 Okla. 479, 139 P. 943."

And in support of this statement they contend, substantially in accordance with the holdings of the trial court, as follows:

1. That the grant in 1883 from the Cherokee Nation to the United States in trust for the use and benefit of the Otoe and Missouria Indians did not convey the river bed adjoining and hence the title remained in the Cherokee Nation until the Treaty of 1891 when it passed by cession and became a part of the domain of the United States.

2. That on advent of statehood the title thereto became subject to determination by the law of the state under which, as declared in the Nolegs case and by statutory enactment, it became the property of the state except to the extent it had been expressly granted prior to statehood.

3. That the patents under which the defendants claim do not expressly include the river bed and therefore the title of the state thereto was not impaired thereby.

In a very elaborate brief on behalf of the state many authorities are cited and discussed touching the division of the powers, national and state, the extent of the state's sovereignty over streams and riparian rights, and with special emphasis upon the case of Wear v. Kansas, 245 U.S. 154, 62 L. Ed. 214, as supporting the Nolegs case upon the construction of riparian grants made prior to statehood. And it is urged that the Brewer-Elliott case does not in substance alter the rule except in cases where the grant of the river bed is in express terms.

If the questions here involved were open for initial determination, much of the material there gathered would be enlightening and helpful. But since we are of the opinion that the material questions here are few and that they are determinable on the basis of legal standards that are fixed, applicable and controlling, we will here consider the issues in the light of such standards and with only such reference to the

state's specific contention as occasion may require.

The controlling question upon the state's claim of title, whether as successor to the title of the United States by operation of law on advent of statehood or from the grantees of the United States through operation of laws judicially declared or enacted since statehood, is whether the stream be navigable in fact.

We consider first the contention that the title to the bed of the stream being in the United States as part of its domain passed to the state upon admission into the Union, and for the purpose we will assume, though not decide, that the title thereto did not pass to the patentees.

The decision in State of Oklahoma v. State of Texas, supra, is controlling. There Indian allottees and others on the north side of the Red River claimed title to the center of the stream and the United States in its own right claimed title to the bed of the river lying south of the center. The State of Oklahoma was there asserting title to the entire bed of the stream. As to the state's claim to the south half the court held as follows:

"Oklahoma claims complete ownership of the entire bed of the river within that state, and, in support of its claim, contends that the river, throughout its course in the state, is navigable, and therefore that, on the admission of the state into the Union, on November 16, 1907 (34 Stat. at L. 2160), the title to the river bed passed from the United States to the state, in virtue of the constitutional rule of equality among the states, whereby each new state becomes, as was each of the original states, the owner of the soil underlying the navigable waters within its borders. If that section of the river be navigable, its bed undoubtedly became the property of the state under that rule. Those who oppose the state's claim recognize that this is so; and the state concedes that its claim is not tenable if that section of the river be not navigable. So the real question in this connection is whether the river is navigable in Oklahoma."

As the basis for its claim, the state sought to establish the fact of navigability by a decision of the state' highest court. Concerning the decision and the claimed effect thereof, the court declared: .

"A decision by the Supreme Court of Oklahoma, in Hale v. Record, 44 Okla. 803, 146 P. 587, is relied on as adjudging that the river is navigable in fact. The opinion in the case is briefly to the effect that in the trial court the evidence was conflicting, that the conflict was there resolved on the side of navigability, and that this finding had reasonable support in the evidence, and therefore could not be disturbed. It was a purely private litigation. The United States was not a party and is not bound. There is in the opinion no statement of the evidence, so the decision hardly can be regarded as persuasive here.

"We conclude that no part of the river within Oklahoma is navigable, and therefore that the title to the bed did not pass to the state on its admission into the Union. If the state has a lawful claim to any part of the bed, it is only such as may be incidental to its ownership of riparian lands on the northerly bank. And so of the grantees and licensees of the state."

And, declaring the test to be navigability in fact and that such test obtained in Oklahoma, it was said in the opinion:

"We find nothing in any of the matters relied on which takes the river in Oklahoma out of the settled rule in this country that navigability in fact is the test of navigability in law, and that whether a river is navigable in fact is to be determined by inquiring whether it is used, or is susceptible of being used, in its natural and ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

The Nolegs case, to which the United States was not a party, is no more controlling here than the Hale-Record case

was there. And with the failure of the Nolegs case, which is the sole basis for the claim of navigability herein, it follows that if, as alleged, the bed of the river did not pass to the riparian claimants, the state's claim thereto is groundless.

We think it clear that the title to the river bed had passed to the defendants notwithstanding there was no express inclusion therein of the river bed, and that their title thereto remained unaffected by the decision in the Nolegs case and the legislative enactment relied on.

The grant from the Cherokee Nation to the United States in trust and the patents here involved merely described the acreage in accordance with the subdivisions of the official survey. The grant was made in pursuance of the treaty of 1866 and pertinent thereto is article 16 of the treaty, of which we quote the first paragraph:

"The United States may settle friendly Indians in any part of the Cherokee county west of 96°, to be taken in a compact form in quantity not exceeding one hundred and sixty acres for each member of each of said tribes thus to be settled; the boundaries of each of said districts to be distinctly marked, and the land conveyed in fee simple to each of said tribes to be held in common or by their members in severalty as the United States may decide."

As to the contention that the grant was ineffective to pass the bed of the stream because not expressly included, note the following in Gertrude H. Hardin v. Conrad N. Jordan, 140 U. S. 371, 35 L. Ed. 428:

"Such being the form of the title granted by the United States to the plaintiff's ancestor, the question is as to the effect of that title in reference to the lake and the bed of the lake in front of the lands actually described in the grant. This question must be decided by some rule of law, and no rule of law can be resorted to for the purpose except the local law of the State of Illinois. If the boundary of the land granted had been a fresh-water river, there can be no doubt that the effect of the grant would have been such as is given to such grants by the law of the state, extending either to the margin or centre of the stream, according to the rules of that law. It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the Federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary."

That it was within contemplation of the treaty of 1866 that the reservations thereafter created would include the bed of the stream is reflected in the reservation created thereafter in 1867 for the Cheyenne and Arapahoe Indians which was declined. That reservation, which was prior to the official survey, expressly recognized that the title, including the lands here involved, extended to the middle of the stream. There appears no reason why the rule announced in the quoted case does not apply. And the fact that the treaty prescribed the definite quantity of acreage for the individual ownership in severalty or otherwise is indicative of the fact the United States had plenary authority in accomplishing the aim. Such being true we hold that the declared rule of construction is to be deemed applicable to the grant to the United States in 1883, and to the patents under which defendants claim. Hence, under the quoted authority, the question is whether the bed passed under the patents without its express inclusion. Under such authority this is dependent upon the local law. And that it would so pass in Oklahoma Territory

was established by the decision in State of Oklahoma v. State of Texas, supra.

As hereinbefore stated, Oklahoma therein contested the river bed rights of the riparian owners of the left or north bank of the stream. Concerning their rights the court there declared:

"In executing the acts there was no attempt to dispose of the river bed separately from the upland. The disposals were all according to the legal subdivisions established by the survey of the upland and shown on the official plat. In the patents there was no express inclusion or exclusion of rights in the river bed.

"Tested by the common law, these conveyances of riparian tracts conferred a title extending not merely to the water line, but to the middle of the stream. Possibly, if the river bed for its entire breadth had been subject to disposal under the Acts of 1900 and 1906, the title would have extended to the Texas boundary along the other side; but this is a debatable question which need not be considered here, for no disposal under those acts could go beyond the medial line. That limitation inhered in all that was done.

"But it was contended that the common-law rule, although formerly adopted in Oklahoma, and recently recognized by the Supreme Court of the state, has been impliedly abrogated by the Legislature. The contention is not sustained by any decision in the state, and, in our opinion, is not tenable. It is based upon statutes displacing or qualifying the common-law rule respecting the rights of riparian proprietors in the natural flow of a stream, which is a matter quite distinct from the ownership of the bed of the stream. The rule as to either could be displaced without affecting the other.

"Our conclusion on the general question is that the disposal of the lands on the northerly bank carried with it a right to the bed of the river as far as, but not beyond, the medial line."

The holding is an express recognition that the common-law rule obtained in Oklahoma and that by reason thereof the title to the bed passed without an express inclusion thereof in the patent.

That the common law so obtained and had since the settlement in 1889 was expressly recognized by the Territorial court in McKennon v. Winn, 1 Okla. 327, 33 P. 582. It is also clear, though not specifically stated, that the Hale-Record case no more controlled the claims of the riparian owners than that of the United States because such claimants prevailed.

It does not appear that the court there considered the 1919 act of Oklahoma Legislature (Laws 1919, ch. 206, p. 293, Tit. 64, O. S. 1941 §290) which is as follows:

"The Commissioners of the Land Office are hereby authorized to lease for oil and gas purposes all lands between mean high water mark in all streams or rivers of two chains or over; all such streams are declared the property of the State of Oklahoma."

However, under the controlling principle applied by the court, any effect of the statute to impair the rights of its grantees under grants prior to statehood would have to be denied. The controlling principle involved was thus declared in George F. Packer v. Jake Bird et al., 137 U. S. 661-673, 34 L. Ed. 819:

"The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the States for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee."

This doctrine was expressly recognized by this court in Vickery v. Yahola Sand & Gravel Co., 158 Okla. 120, 12 P. 2d 881.

In the case of Brewer-Elliott Oil & Gas Co. v. United States et al., supra, the State of Oklahoma was asserting claim to the bed of the Arkansas river, in the same locality as here, against the United States who, as trustee for the

Osage Tribe of Indians, held title to that portion of the left or north bed that lay opposite the Osage reservation, which was expressly included in the grant to the United States. There was asserted on behalf of the state the same contentions as are made herein except that the contention here is that the state succeeded to the title of the United States to that portion of the bed which had not been expressly conveyed prior to statehood. Therein the state relied specifically upon the decision in the Nolegs case, the decision in Wear v. Kansas, supra, as supporting the pronouncement in the Nolegs case, and the legislative act hereinbefore quoted, and they were all considered by the court in reaching its determinations.

In the opinion, after holding there was no need to dispose of the question, whether the United States could have so disposed of the river bed if same were navigable, because the same was not navigable, the court said:

"If the Arkansas river is not navigable, then the title of the Osages, as granted, certainly included the bed of the river as far as the main channel, because the words of the grant expressly carry the title to that line.

"But it is said that the navigability of the Arkansas river is a local question, to be settled by the Legislature and the courts of Oklahoma, and that the Supreme Court of the state has held that, at the very point here in dispute, the river is navigable. State v. Nolegs, 40 Okla. 479, 139 P. 943. A similar argument was made for the same purpose in Oklahoma v. Texas, supra, based on a decision by the Supreme Court of Oklahoma as to the Red river. Hale v. Record, 44 Okla. 803, 146 P. 587. The controlling effect of the state court decision was there denied because the United States had not been there, as it was not here, a party to the case in the state court. Economy Light & P. Co. v. United State, 256 U. S. 113, 123, 65 L. Ed. 847, 854, 41 Sup. Ct. Rep. 409. In such a case as this, the navigability of the stream is not a local question for the state tribunals to settle. The question here is what title, if any, the

Osages took in the river bed in 1872, when this grant was made, and that was thirty-five years before Oklahoma was taken into the Union, and before there were any local tribunals to decide any such questions. As to such a grant, the judgment of the state court does not bind us, for the validity and effect of an act done by the United States is necessarily a Federal question. The title of the Indians grows out of a Federal grant when the Federal government had complete sovereignty over the territory in question. Oklahoma, when she came into the Union, took sovereignty over the public lands in the condition of ownership as they were then, and if the bed of a nonnavigable stream had then become the property of the Osages, there was nothing in the admission of Oklahoma into a constitutional equality of power with other states which required or permitted a devesting of the title. It is not for a state, by courts or Legislature, in dealing with the general subject of beds of streams, to adopt a retroactive rule for determining navigability which would destroy a title already accrued under Federal law and grant, or would enlarge what actually passed to the state, at the time of her admission, under the constitutional rule of equality here invoked."

It is manifest from what is said that the state can predicate no claim of title to the river bed upon authority of the holding in the Nolegs case nor upon the intended purpose of the legislative act.

The contention that the quoted case is authority for the contention that to convey the river bed as against the claim of the state thereto such conveyance must expressly include the bed in the grant is clearly unjustified by anything that is said in the opinion. The emphasis there placed upon the express inclusion of the bed in the grant is solely to stress the fact that such was the intention. There is nothing to indicate that without the express inclusion such intention would not be presumed as declared in Hardin v. Jordan hereinbefore quoted. On the contrary, it is expressly declared in State of Oklahoma v. State of Texas, supra, that

like conveyances executed prior to statehood would be construed according to the common law under which the title of grantees would extend to middle of the stream. And the court there rejected the contention that the common law rule had been impliedly abrogated in Oklahoma.

The chief basis of the argument on behalf of the state is based on the holding of the court in Wear v. Kansas, supra. If that case could be deemed controlling of the issues here presented its consideration would be pertinent. Whether it is or is not controlling is a Federal question and the authoritative determination of the applicability rests with the United States Supreme Court. In the quoted case reliance was placed on the Wear case in support of the same contentions that are made here.

The court there refused to recognize that the decision in the Wear case was applicable and expressly distinguished it in announcing the principles that are governing both there and here.

Furthermore, the reliance herein upon the Wear case is solely for its support of the decision in the Nolegs case as an authoritative pronouncement on the question of navigability. In the Brewer-Elliott case, supra, the court, on direct consideration of the Nolegs case, expressly declared that the pronouncement therein was not authoritative. It cannot be here successfully urged that the implied support of the Nolegs case to be found in the Wear case can be applicable in face of the holding of the court in the Brewer-Elliott case that the Nolegs case is not supportable and that the Wear case is not applicable thereto. For this court to sustain the holding in the Nolegs case on authority of the Wear case as contended for would, under the circumstances, be tantamount to overruling the decision of the United States Supreme Court, in the Brewer-Elliott case.

Our conclusion accords in all respects with that reached in United States v. Champlin Refining Co. et al., supra, which was affirmed by the Supreme Court of the United States in Champlin Refining Co. v. United States et al., 329 U. S. 29, 91 L. Ed. 9, 67 S. Ct. 1, on authority of State of Oklahoma v. State of Texas, supra, and Brewer-Elliott Oil & Gas Co. v. United States, supra.

It is strenuously urged that the holding in the Champlin case where the title had not passed from the allottee to whom granted should not be deemed applicable here where the title had passed from the allottee. We see no basis for the distinction. In either case the decision must rest upon whether the title to the middle of the stream did or did not pass at the time of the Federal grant and subsequent transfers could not alter such fact.

The judgments are reversed and both causes are remanded, with directions that in each case, on the question of title to the premises involved, the court render judgment for defendant according to their several and respective rights, and take such further proceedings as the cases may require, not inconsistent herewith.

DAVISON, V.C.J., and BAYLESS, CORN, and LUTTRELL, JJ., concur. RILEY and WELCH, JJ., dissent.

RILEY, J. (dissenting). Plaintiffs in error are the owners and lessees of land located in township 23 north, range 3 east I.M., Pawnee county, Oklahoma, particularly described as lots 6 and 7, sec. 23, and lot 8 S.W. 1-4 sec. 24 within the township and range. Plaintiffs' lands, bordering on the south bank of the Arkansas river, formed a part of the public domain acquired as result of the Louisiana Purchase.

In 1828 the lands, by the Federal government, were conveyed to the Cherokee Nation and for more than 30 years the Cherokee Nation exercised over the entire area a complete sovereignty. In 1866 the Cherokee Nation consented that friendly Indians might be settled upon their domain. In 1872, by conveyance from the Cherokee Na-

tion to the Osage Tribe, confirmed by Act of Congress, title to the lands on the north of the river, opposite the lands here involved and extending to "the north line of the Creek country and the main channel of the Arkansas River" passed to the Osage Tribe.

In 1883 the Cherokee Nation conveyed to the Federal government, in trust for the use of the Otoe and Missouria Tribes of Indians, lands "lying and being on the right bank of the Arkansas River".

The lands so conveyed included the lands in controversy, which were subsequently allotted to individual Otoe and Missouria Indians. The bed of the Arkansas river, extending from the thread of the stream southward, was not granted or allotted to either of the tribes or to any person.

The right of dominion and control over the whole of the river bed and, except as to that part conveyed to the Osage Indians under express grant, remained in the Cherokee Nation until 1891 when, by treaty, the Cherokee Nation relinquished to the Federal government its right as to a part of the lands embraced within the Cherokee Outlet.

As the Cherokee Nation's right extended to and included dominion and control over the segment of the river bed here involved, it is clear that by the relinquishment, dominion and control again vested in the Federal government.

The exact issue in the cases at bar is whether defendant owners and lessees of adjacent land may extend their claims of ownership to the bed of the river and possess a vested right such as may not be impaired by act or judgment within the power and authority of the State of Oklahoma. State v. Nolegs, 40 Okla. 479, 139 P. 943; Title 64 O.S. 1941 §290; S.L. 1919, ch. 206, p. 293, §1.

Defendants contend that the Arkansas river adjacent to the lands is not,

and never has been, navigable; that nonnavigability of the river was implied by the grant under which the Osage Tribe of Indians acquired title to a portion of the river bed; that at the time the land adjacent to the river was acquired by defendants their rights as riparian owners extended to the main channel and bed of the river under an existing rule of law governing nonnavigable rivers whereby an adjacent owner's right extended to the thread of nonnavigable streams; that defendants' rights became vested and were not subject to change.

Defendants' case is dependent upon nonnavigability of the river. That matter was settled once and for all, throughout the entire course of the river within the State of Kansas, much nearer to the source than its course in Oklahoma, by the process of judicial notice as espoused by the jurist Brewer. The Supreme Court of Kansas took notice of the river's navigability. Wood v. Fowler (1882) 26 Kan. 682, 40 Am. Rep. 330; Hurst v. Dana, 86 Kan. 947, 122 P. 1041. The State of Oklahoma followed Kansas in adopting the rule of law. The rule of law "displaces evidence", since it stands for the "same thing". 20 Am. Jur. 47. It avoids variability in facts and establishes uniformity, an objective in American jurisprudence. The circumstances in Kansas were the same. If within the State of Oklahoma, as in Kansas, the rule of law prevails, defendants' claims to the river bed, not arising by express grant but dependent wholly upon nonnavigability in fact, which, in view of the rule of law may not be proved, fail and defendants' claims are excluded by the paramount sovereign right. Shapleigh v. Mier, 299 U.S. 468, 81 L. Ed. 355, 113 A.L.R. 253.

Brewer-Elliott O. & G. Co. v. United States, 260 U.S. 77, 67 L. Ed. 140, Oklahoma v. Texas, 258 U.S. 574, 66 L. Ed. 773; United States v. Hayes (C.C.A. 8) 20 Fed. 2d 873, are cited in support of defendants' contention that where the stream is in fact nonnavigable a grant to adjacent land conveys to grantee

such a vested right extended to the thread of the stream that it is not subject to a changed rule of law. These cases do not support defendants' case.

In Brewer-Elliott v. United States and Oklahoma v. Texas, supra, the issue was whether the United States could, by express grant, divest itself of title to navigable streams and vest such rights in a grantee that they were not affected by subsequent state action.

In Brewer-Elliott v. United States, involving the express grant to the Osage Tribe, approved by Act of Congress, the Supreme Court of the United States said that if the Arkansas river were navigable the issue then would be whether the United States, as an exclusive sovereign, could for any purpose divest itself of dominion and control over navigable rivers, and if it could so vest title to navigable rivers to accomplish great exigencies in government, the question then would be whether the express grant by which the Osages acquired a portion of the river bed was within that purpose. But a determination of the issues of law so stated was unnecessary because the trial court had found as a fact that the river, at the particular point, was nonnavigable, and there was some evidence to support the trial court's finding of fact.

In Brewer-Elliott v. United States, the Supreme Court of the United States recognized right of the state, where no express grant had been made to the bed of the stream, to define and restrict riparian rights. The court said:

"In government patents containing no words showing purpose to define riparian rights, the intention to abide the state law is inferred. Mr. Justice Bradley, speaking for the court in Hardin v. Jordan, 140 U.S. 371, 384, 35 L. Ed. 428, 434, 11 Sup. Ct. 808, said:

" 'In our judgment, the grants of the government for lands, bounded on streams and other waters without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie."

"Some states have sought to retain title to the beds of streams by recognizing them as navigable when they are not actually so. It seems to be a convenient method of preserving their control. No one can object to it unless it is sought thereby to conclude one whose right to the bed of the river, granted and vesting before statehood, depends for its validity on nonnavigability of the stream in fact. In such a case, navigability vel non is not a local question. In Wear v. Kansas, 245 U.S. 154, 62 L. Ed. 214, 38 Sup. Ct. Rep. 55, Ann. Cas. 1918B, 586, upon which the appellants rely, the patent of the United States under which Wear derived title was a grant, made before statehood, to land bordering on the Kansas River, without restriction, reservation, or expansion. The state tribunal took judicial notice of the navigability of the river, refused to hear evidence thereon, and held that the patent to land on the navigable stream did not convey the bed of the river. The United States, by its unrestricted patent, was properly taken to have assented to its construction according to local law. Whether the local law worked its purpose by conclusively determining the navigability of the stream, without regard to the fact, or by expressly denying a riparian title to the bed of a nonnavigable stream, was immaterial. In either view the result there would have been the same."

In Oklahoma v. Texas, supra, the Supreme Court of the United States held where the Federal government had conveyed lands north of the middle of the main channel of Red river, thus including by express grant a part of the river bed, the fact of navigability vel non was a justiciable issue. Again, it was found from the facts in evidence that the river was nonnavigable. Certainly title to that part of the bed of the river which had been conveyed by express grant of the Federal government did not, at statehood vest in the State of Oklahoma. The State of Oklahoma was not successor in interest to the United States because the interest of the United States had, prior to statehood, been divested.

In United States v. Hayes, supra, there was involved a grant by the Federal government to the Five Civilized Tribes, inclusive of a grant to the Creeks. The grant expressly extended to a portion of the Arkansas and Cimarron rivers.

The lands were later allotted to individual Indians. The individual allotments to Creek Indians described land adjoining the river bed. It was held, by virtue of the source of the title and the Federal policy to abolish tribal governments, that riparian rights extended to include the river bed. There was no contention that title to the river bed should remain vested in the abolished government of the tribes. The title could not be suspended. The issue of navigability was said to have been settled in Brewer - Elliott v. United States, supra, and that the intent of Congress, evidenced by its Acts, and the agreements was to allot all the lands of the tribe necessarily including the river bed.

But neither the grant involved in the case at bar, from the Cherokee Nation to the Federal government in trust for the Otoe and Missouria Tribes, nor the patents issued by the Federal government to members of the tribes, contained any language to indicate an intention to convey any portion of the river bed. Whatever riparian rights obtained from the adjacent land granted is necessarily dependent upon a rule of law or a question of fact by which navigability may now be determined. The river bed, not being within the express terms of the grants, neither navigability nor nonnavigability in fact at the particular time was fixed. If neither, as a fact, were fixed, defendants' rights now claimed were not vested. It is believed the navigability is dependent upon such a rule of law or question of fact as may be selected by the state. Brewer-Elliott v. United States, supra. Judicial notice is a well intrenched part of the judicial system; it is an exception to the presumption that when a case is presented at the bar for trial, the court or jury are uninformed concerning the facts involved or that it is incumbent upon plaintiff to establish by evidence the facts plead. 20 Am. Jur. §16, Evidence.

In Wear v. Kansas, supra, the Supreme Court of the United States considered a conveyance by the Federal government at a time prior to statehood in Kansas; the land adjoined the Kansas river; the grant did not expressly include any portion of the river bed. After statehood, the Supreme Court of Kansas, Wood v. Fowler, 16 Kan. 682, 40 Am. Rep. 330, and Hurst v. Dana, supra, established a rule of law applicable in all such cases and exclusive of facts as might vary in each case. The court took judicial notice that the Kansas and Arkansas rivers were, throughout their entire courses in Kansas, navigable. The Supreme Court of Kansas, with reason, observed the river was, a hundred years ago, navigable, i.e., used in commerce under the times and conditions of the people, and having been navigable in fact, lack of navigation at any subsequent time did not negative the river's navigability. Thus, in avoidance of a multiplicity of divergent cases, dependent upon facts as might be proved, the courts of Kansas settled the issue once and for all by taking judicial notice of the fact.

In Wear's appeal to the Supreme Court of the United States, as to his contention that navigability in fact was the test to be applied by state courts, it was held:

" . . . if a state court takes upon itself to know without evidence whether the principal river of the state is navigable . . . we certainly cannot pronounce it error. In this aspect it is a question of state law. The fact is of a kind that should be established once for all, not perpetually retried."

It may be observed that in Kansas, nearer the source of the river, it is, by state law, approved federally, navigable. The river was agreed to be navigable within Oklahoma, Vickery v. Yahola Sand & Gravel Co., 158 Okla.

120, 12 P. 2d 881. Navigability is not synonymous with present navigation, but a river is navigable when it is susceptible of being used in its ordinary condition as a highway for commerce. 10 Wall. 557; Webster's New Int. Dictionary.

No man has a vested right in a rule of law. In Oklahoma, a constitutional limitation was required to vest a right in a rule of law after an action involving it was commenced. sec. 52, art. 5, Const. No state of the Union is superior to any other state, but at the advent of statehood, Oklahoma became vested with the same character of sovereignty theretofore possessed by all other states. An incident of sovereignty was authority and power, where rights were not by express grants vested, to establish rules of evidence applicable to all property within boundaries of the state and to make effective such rules of evidence.

Whether a stream should be declared navigable under the common law of England, i.e., to the extent that the tide ebbs, and flows within it, as in the case of the Mississippi river along the Illinois shore where it is nonnavigable, or dependent upon some other fact, i.e., commercial navigation as in the case of the Mississippi river from the thread of the stream off the Illinois shore toward the shore of Iowa where it is navigable, seems to be, as applied to rivers within a state, a matter of state law. Donnelly v. United States, 228 U.S. 243, 57 L. Ed. 820, 33 Sup. Ct. 449, Anno. Cas. 1913E, 710.

This state has established once and for all such a rule which the trial court followed. State v. Nolegs, supra. Had the trial court not followed the rule promulgated, it would have been subject to this court's superintending control and to correction on appeal. No right or title to the bed of the Arkansas river vested in defendants prior to the trial court's determination against them. Their right was dependant upon a claim; the claim was that the river was in fact nonnavigable. Defendants had no choice of means by which their right would be established or denied. They were not divested of any vested right by the mode of determination.

In Packer v. Bird, 137 U.S. 661, 34 L. Ed. 819, the Supreme Court said:

"The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the States for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee. **As an incident of such ownership the rights of the riparian owner, where the waters are above the influence of the tide, will be limited according to the law of the State, either to low or high water mark, or will extend to the middle of the stream.**"

If the rule there stated is followed, a decision favorable to the state seems impelled.

In Oklahoma v. Texas, supra, there had been no determination of the decisive factor by the State of Oklahoma in decision to which the state was a party, nor was there in existence on the part of the state a legislative act curtailing riparian rights extended to land not granted or devised which formed the beds of streams. 64 O.S. 1941 §290. Neither the State of Oklahoma nor the United States is bound by decision in private litigation, notwithstanding that title to unclaimed land acquired by the state from the United States may be effectively asserted by action of the state.

State v. Nolegs, supra, was recognized as sound in principle by the highest Federal court in Brewer-Elliott v. United States, supra; that court's judgment was consistent with its affirmance of the rule in Kansas, applicable to the same river.

The Arkansas river's navigability, as determined by the state, and as a matter

of law, does not disturb rights vested by the express grant of the Federal government.

Thus, whether the inference was to be drawn that the grant to the Osages extended to the main channel of the river because the river was. nonnavigable in 1872, or because under the Federal policy their existing title to navigable streams could be granted, seems to have very little to do with riparian rights of lands not granted.

Except in United States v. Champlin, 156 Fed. 2d 769, in no case to which attention is called has the Federal government denied the state's power and authority to limit riparian rights to the bed of streams within boundaries of the state.

Vickery v. Yahola Sand & Gravel Co., supra, is cited to show that no longer is the rule stated in State v. Nolegs the law in Oklahoma. The Vickery case concerned the bed of the Arkansas river at a point below the confluence of the Grand river where the Arkansas was admittedly navigable in fact and in law. In that case the court construed a Federal grant to the Cherokee Nation and was impelled to apply the fact of existing navigation as the test of navigability.

In the cases at bar this court does not have before it an express grant to the river bed. Defendants' claims to the river bed rest upon nonnavigability of the river. Navigability is not dependent upon the fact of navigation at any particular place or at any particular time. Evidence of the fact is foreclosed by the rule of law.

In the Vickery case we said "the same question was involved in United States v. Brewer-Elliott O. & G. Co., . . . wherein the Federal court refused to follow the Nolegs case," but we took pains to show the reason was that an express grant to a portion of the river bed was involved and that only under such circumstances could the state rule be avoided to sustain rights vested by the terms of an express grant.

In City of Tulsa v. Com'rs of the Land Office, 187 Okla. 82, 101 P. 2d 246, and City of Tulsa v. Peacock, 181 Okla. 383, 74 P. 2d 359, this court assumed that the Arkansas river was navigable and that except for specific grants the state owned the bed of the river.

While it is true that the Federal courts have declined to follow the rule of the Nolegs case, that the Arkansas river is navigable throughout its course in Oklahoma, its refusal to do so, except for United States v. Champlin, has been limited to specific and express grants to the river bed. Other than as applied to such grants, the rule of the Nolegs case prevails to govern, and where a state court properly takes judicial notice of a fact, evidence is not admissible to prove the contrary.

There are fundamental issues of state rights involved. These were once thought to have been settled:

"Subject to the paramount authority of Congress to control navigation so far as may be necessary for the regulation of commerce among the states and with foreign nations, each state has authority to establish for itself such rules of property as it may deem expedient in respect of the ownership of the lands forming the beds and banks of navigable waters within its borders; and the ownership of such lands, as between the state and riparian owners, is to be determined according to the local law of the state in which they are situated." 45 C.J. 537; Arkansas v. Tennessee, 246 U.S. 158, 62 L. Ed. 638; United States v. Cress, 243 U.S. 316, 61 L. Ed. 746; Fox River Paper Co. v. Wisconsin R. Commn., 274 U.S. 651, 71 L. Ed. 1279; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 57 L. Ed. 1063; McGilvra v. Ross, 215 U.S. 70, 54 L. Ed. 95; Shively v. Bowlby, 152 U.S. 1, 38 L. Ed. 331; Barney v. Keokuk, 94 U.S. 324, 24 L. Ed. 224."

The rule above stated prevails in New York, Iowa, Idaho, Kansas, Minnesota, Ohio, and Oregon.

Wood v. Fowler, supra, involving title to the bed of the Kansas river, and

Hurst v. Dana, supra, involving title to the bed of the Arkansas river, follow the general rule that:

"Courts take judicial notice of the navigability of streams constituting great national highways of commerce, as well as the navigability or nonnavigability of smaller streams within the jurisdiction." 31 C.J.S. §33.

In Grand River Dam Authority v. Going, 29 Fed. Supp. 316, the Federal court took judicial notice of the navigability of the Arkansas river in a part of its course through Oklahoma and throughout its course in the State of Arkansas. See, also, Shore v. Shell Pet. Corp., 60 Fed. 2d 1, certiorari denied 287 U.S. 656; Shore v. Shell Pet. Corp., 55 Fed. 2d 696; Jackson-Walker Coal & Material Co. v. Hodges, 283 Fed. 457. Thus there is navigability of the Arkansas river above the Kansas line and from the west line of Arkansas to the mouth of Grand river near Fort Gibson, Okla.

That judicial notice is a proper mode to determine once for all navigability vel non is well settled. United States v. Griffin, 58 F. 2d 674; Sikes v. Moline Consumers' Co., 293 Ill. 112, 127 N. E. 342; Bohm v. Gerdes, 309 Ill. App. 206, 32 N.E. 2d 1000; McClain v. Kansas City Bridge Co. (Mo. App.) 83 S.W. 2d 132; Brownsville & Matamoros Municipal Bridge Co. v. Gateway Bridge Co. (Tex. Civ. App.) 2 S.W. 2d 1012; Continental Land Co. v. United States, 88 F. 2d 104; Harris v. Central Nebraska Public Power & Irrigation Dist., 29 F. Supp. 425.

Also, such judicial notice as a method extends to smaller streams. State of Arizona v. State of California, 283 U.S. 423, 75 L. Ed. 1154; Alabama Power Co. v. Gulf Power Co., 283 F. 606; Hill v. McClintock, 175 Ark. 1059, 1 S.W. 2d 564; Carlton, for Use of Franklin Co. v. Constitution Indemnity Co., 117 Fla. 143, 157 So. 431; Day v. City of St. Augustine, 104 Fla. 261, 139 So. 880; State ex rel. Bd. of Com'rs of Atchafalaya Basin Levee Dist. v. Capdeville, 146 La. 94, 83 So. 421;

Town of Napoleonville v. Boudeaux, (La. App.) 142 So. 874; Brown v. Aetna Casualty & Surety Co. (Tex. Civ. App.) 122 S.W. 2d 261; Hobart-Lee Tie Co. v. Grabner, 206 Mo. App. 96, 219 S.W. 975.

In the latter case it was said:

" . . . But where the court must, as we are bound to do, take judicial notice of the navigable streams of Missouri, when used in the broad sense, where the bed of the river is retained in the public and not deeded to the adjoining landowners, an admission by both parties that such a stream was navigable would not and could not bind the courts in determining the issues in the case."

In a case following Hurst v. Dana, supra, and Wood v. Fowler, supra, the Supreme Court of the United States has said:

" . . . if a state court takes upon itself to know without evidence whether the principal river of the state is navigable at the capital of the state, we certainly cannot pronounce it error. In this aspect it is a question of state law."

Wear d/b/a Wear Sand Co. and F. D. Fowler v. State of Kansas ex rel. Brewster, Attorney General, 245 U.S. 154, 62 L. Ed. 214. There, the issue of navigability of the Kansas river was under consideration; the Supreme Court reaffirmed application of the rule.

The decision in the Wear case firmly fixed the doctrine that the issue is one for state law and that judicial notice is proper so that "The fact . . . should be established once for all, not perpetually retried".

If the power and authority to take judicial notice of the navigability of a stream within its borders exist in Kansas and in other states, so that ownership to the bed of streams may thereby be determined, the same power and authority exist in Oklahoma. Otherwise, the State of Oklahoma was not admitted into the Union upon an equality with other states but by reason of a Constitution, federally imposed, de-

terminative of title to its river beds, it occupies an inferior status.

In Coyle v. Smith, Secretary of State of Oklahoma, 221 U.S. 559, 55 L. Ed. 853, the authority of the State of Oklahoma to remove its capital was involved. It was then thought that the new state was admitted into the Union with all powers peculiar to a divided sovereign. This state then, as did the original states, had jurisdiction in matters of local law. Power and authority were not, and could not be, by congressionally expressed limitation (as to removal of the capital) diminished or impaired. By that monumental decision in confirmation of state rights, shortly rendered after statehood, the Supreme Court of the United States determined that equality of states within the Union existed as a fundamental principle of the general government. Citizenship and rights pertaining were not, as within the late German empire, withheld or graded.

Under the rule of equality and doctrine of judicial notice adopted within this jurisdiction, following the precedent of Kansas, navigability of the Arkansas river may not exist within the State of Kansas, to be nonexistent within the State of Oklahoma—a fortiori as applied to the same river.

That the state owns the bed of navigable streams, subject to certain powers reserved to the Federal government under the Constitution, is beyond question. 45 C.J. 537, supra. The source of that title goes farther back than 1907 when Oklahoma was admitted to the Union. In St. Clair County v. Lovingston (Wall.) 23 L. Ed. 59, the unchangeable historical fact was noted:

"By the American Revolution the people of each State, in their sovereign character, acquired the absolute right to all their navigable waters and the soil under them. Martin v. Waddell, 16 Pet. 367; Russell v. Jersey Co., 15 How. 426. The shores of navigable waters and the soil under them were not granted by the Constitution to the United States, but were reserved to the States respectively. And new States have the same rights of sovereignty and jurisdiction over this subject as the original ones."

The Supreme Court of the United States so holds: Pollard v. Hagan, 11 L. Ed. 565; Shively v. Bowlby, 38 L. Ed. 331.

In Martin et al. v. Lessee of Waddell, 16 Pet. 367, 10 L. Ed. 997, the historical fact was judicially fixed:

" . . . when the Revolution took place the people of each State became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government."

This common right inured to the new states admitted to the Union. Pollard v. Hagan, 11 L. Ed. 565. Alabama, upon admission, succeeded to all rights of sovereignty possessed by Georgia at the date of the cession. These rights were excepted only insofar as diminished by the public lands remaining in the possession and under the control of the United States. Alabama became entitled to the soil under navigable waters, the same as original states; nothing remained to the United States but the public lands. The public lands did not include lands below high-water marks in navigable streams.

The rule was clearly recognized in Oklahoma v. Texas, 66 L. Ed. 771. There the title to a segment of the bed of Red river was in dispute between the United States, the State of Oklahoma, the State of Texas, and owners of the adjacent uplands. Therein (after stating the basis of the claim of the State of Oklahoma as to the navigability of the river throughout its course in the state and that therefore "on admission of the state into the Union on November 16, 1907, the title to the river bed passed from the United States to the State, in virtue of the constitutional rule of equality among the states, whereby each new state becomes, as

was each of the original states, the owner of the soil underlying the navigable waters within its borders") the court said: "If that section of the river be navigable, its bed undoubtedly became the property of the state under that rule."

" . . . And the territories acquired by Congress, whether by deed of cession from the original states, or by treaty with a foreign country, are held with the object, as soon as their population and condition justify it, of being admitted into the Union as states, upon an equal footing with the original states in all respects; and the title and dominion of the tide waters and the lands under them are held by the United States for the benefit of the whole people, and, as this court has often said, in cases above cited, 'in trust for the future states'." Shively v. Bowlby, 38 L. Ed. 331.

It thus appears that the following rules of law were once established:

(1) The question of ownership of the beds of navigable rivers is determinable under the law of the state wherein the river is located;

(2) Courts may and should take judicial notice of the navigability or non-navigability of rivers within their respective jurisdictions;

(3) This authority within the courts is common to all the states. This authority and power may not be denied one state and allowed others.

(4) After the American Revolution, the people of the original thirteen states became themselves sovereign. In that character, they held, and now hold, the soils under navigable streams, subject only to the rights granted the general government by the Constitution of the United States.

The judgment of the trial court is in conformity with the foregoing rules, and while the judgment appealed is not essentially different in legal aspects from those involved in Champlin v. United States, as decided adversely by the United States Circuit Court of Appeals and affirmed by the Supreme Court of the United States, we think these decisions are erroneous in this, to wit:

(1) Originally the Federal courts avoided the real issue involved by resort to the fact of navigability which, according to Federal view, should be settled once and for all in law under the doctrine of judicial notice;

(2) The Federal courts either erred in Wear v. Kansas, supra, or they err now.

In the Federal courts at the present time labor in error, the courts of the state need not perpetuate the error to the particular state's disadvantage. The Federal courts should be the judge of their own error, but if there is failure so to do, the error need not be perpetual since federally the courts are limited in the exercise of jurisdiction to such exceptions and under such regulations as the Congress may from time to time declare. That erroneous Federal decisions have been recalled is attested by history relating to the Dredd Scott decision as to slavery, income tax decisions, child labor, and the like.

To indulge the error of the Federal courts in relation to the Arkansas river, in my opinion, is to **destroy** the rule of law existing within this state and stated in the Nolegs case, supra. It is to **defeat** the act of the Legislature of Oklahoma, supra, which had for its purpose the placing of dominion and control of the bed of the Arkansas river throughout its course, and all other rivers two chains or more in width, within this jurisdiction, in the Commissioners of the Land Office, and avoid Federal and state co-operation under which the state is bound to furnish land and right of way for dams and lakes to be devoted to flood control and the protection of lives and property of our citizenship as well as furnishing of energy to afford rural electrification and the manufacture of munitions requisite for the national defense.

I am persuaded that Commissioners of the Land Office should not be divested of that with which they were invested in trust for the education of people in this democratic state, and I think an affirmative decision essential for the safety of the state as it now exists and as it should in future exist for unborn generations. An adverse decision, in my opinion, will constitute a gift of that which belongs to all in esse. It will be a grant of the birthright of the future citizenship.

I respectfully dissent.