## UNITED STATES v. HUTCHINGS et al.

(District Court, W. D. Oklahoma. March 4, 1918.)

### No. 839.

1. NAVIGABLE WATERS ⬳1(6)—ARKANSAS RIVER——INDIAN RESERVATIONS.

   The Arkansas river at a point between Osage and Pawnee counties, Okl., is not navigable, and the Osage Tribe acquired title to the bed as far as the middle of the main channel of the stream at the date of Act June 5, 1872.

2. WATERS AND WATER COURSES ⬳89—INDIAN LANDS—SURVEY.

   Where the original government survey commenced in 1871 and finished in 1872 plainly indicated an island in the Arkansas river which bounded the Osage Reservation, the fact that the island was not meandered or surveyed did not affect the claim of the tribe thereto; indeed, title would not have been affected had the island been wholly ignored.

3. INDIANS ⬳13—INDIAN LANDS—ALLOTMENT—ILLEGALITY.

   Where an island belonging to the Osage Tribe was claimed by others, suit by the United States for the benefit of the tribe and allottee cannot be defeated on the ground of the illegality of the allotment.

4. WATERS AND WATER COURSES ⬳89—INDIAN RESERVATIONS—MEANDER LINES OF RIVER.

   Where an Indian reservation was by act of Congress bounded by the main channel of a river, the meander lines of the river are not to be deemed the traverse lines bounding the reservation.

5. WATERS AND WATER COURSES ⬳89—INDIAN RESERVATIONS—BOUNDARY—"MAIN CHANNEL"—"CHANNEL."

   Under Act June 5, 1872, describing the Osage Reservation as bounded by the main channel of the Arkansas river, the "main channel" does not simply mean the main branch of the river, for the "channel" of a river is less comprehensive and means primarily its bed, and hence the reservation extended to the main channel.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Channel; Main Channel.]

6. WATERS AND WATER COURSES ⬳92—BOUNDARIES—ISLAND.

   The division line between opposite riparian owners on a nonnavigable stream would be the middle of the stream, and, if that line falls upon an island, a division of the island is required.

7. WATERS AND WATER COURSES ⬳89—INDIAN LANDS—RESERVATION.

   An island between Osage and Pawnee counties, Okl., *held* to belong to the Osage Indian Tribe under Act June 5, 1872, which described reservation as extending to main channel of Arkansas river, which at that time was on the side of the island furthest from the reservation.

In Equity. Suit by the United States against G. W. Hutchings and others. Decree for complainant.

Francis J. Kearful, Asst. Atty. Gen., John A. Fain, U. S. Atty., of Lawton, Okl., and Isaac D. Taylor, of Oklahoma City, Okl., for the United States.

S. P. Freeling, Atty. Gen. of Oklahoma, Ledbetter, Stuart & Bell and Burwell, Crockett & Johnson, all of Oklahoma City, Okl., and Dillard & Blake, Rice & Lyons, and A. J. Biddison, all of Tulsa, Okl., for defendants.

COTTERAL, District Judge. This suit involves the title to an island, located in the Arkansas river between Osage and Pawnee coun-

ties, in this state, described by the government survey of 1908 as lot 7, in section 25, township 21 north, range 8 east, and lot 11, in section 30, same township, range 9 east, and extending across the range line dividing those sections.

The bill was filed by the United States, for itself and as trustee for the Osage Tribe of Indians, and Larry Nolegs, one of its members, against the commissioners of the state land office, the Attorney General and an assistant, and certain individuals and companies, and charges that the tribe acquired title to the island, as a part of its reservation, by deed of the Cherokee Nation to the United States in trust for the tribe on June 14, 1883, and by an act of Congress, approved June 5, 1872 (Act June 5, 1872, c. 310, 17 Stat. 228); that in June, 1909, the island was duly allotted to Nolegs as a part of his surplus lands, pursuant to the Act of June 28, 1906 (34 Stat. 539, c. 3572), whereby the underlying minerals were reserved to the tribe and are subject to lease and have been leased under federal supervision for its benefit; and that the defendants have no right, title, or interest in or to the island. A decree is prayed for an injunction against acts of the defendants threatening interference with the possession of the island by the United States and the allottee, and removal of the oil and other minerals therefrom, and for other proper relief.

The defendants deny that the island ever became a part of the reservation, or that the tribe acquired any title to it, or that it has been leased for the tribe. The state officers consent in their answer to the suit as against the state, and allege that the Arkansas river is a navigable stream, and that as a result title to the island inured to the state on its admission in 1907, and that it was rightfully leased for the production of oil and gas by the commissioners of the state land office to the Jim Crow Oil Company, according to state law. That company adopts the same averments in its answer. The answer of defendant Thomas, and his lessees, Guffey and the Producers' Oil Company, denies that the land involved is an island, as shown by omission from the government survey of 1871 and 1872, and makes claim to the premises upon homestead patents for portions of sections 25 and 26, on the south shore of the river, opened to settlement and entry as public lands on September 16, 1893. Act March 3, 1893, c. 209, 27 Stat. 640; Proclamation Aug. 19, 1893, 28 Stat. 1222. The death of Thomas having occurred pending the suit, a revivor was ordered against his personal representative. The defendant Edminston and his lessee, the Milliken Oil Company, also deny the existence of the island, and claim title under a like homestead patent to a grantor for lands in section 30, on the south shore of the river. That company, after a retransfer of interest to Edminston, withdrew from the suit.

The defendants were restrained by temporary orders from interfering with the possession of the plaintiff and the allottee. The receivership in the case No. 75, entitled "United States v. Brewer-Elliott Oil Company and Others," extends to the oil production in sections 25 and 30, except upon the island. On stipulation, it was ordered that the equipment of the Producers' Oil Company might be removed or sold, and the proceeds of any oil in its tanks deposited with the

clerk of this court. Another order also enjoined the defendant Edminston from interfering with the operation of a lease.

[1] In the case No. 75, tried jointly with this, questions were decided of vital importance to this controversy, and for convenience the opinion and findings in that case are adopted without formal repetition. The title of the Osage Indians to the bed of the Arkansas river was considered, and it was determined that the river at the location of the island is not and has not been navigable, and that in consequence the Osage Tribe acquired title to the bed as far as the middle of the main channel of the stream, at the date of the Act of June 5, 1872.

As no claim is made on behalf of the state and its lessee to the island except on the ground of the navigability of the river, they have no title to or interest in the island. This leaves the controversy as between the government, representing the tribe and allottee, and the adjacent landowners and their lessees on the extreme south shore of the river.

The title of the tribe is rested on the two grounds: That the island was conveyed by the Cherokee deed of June 14, 1883; and that it was included within the limits of the reservation confirmed by the Act of June 5, 1872, whereby it was bounded by the main channel of the river, then located on the south side of the island.

[2] The assertion that the island had no existence at the date of the original government survey, commenced in 1871 and finished in 1872, is wholly untenable, as it was indicated in the river by the plat and field notes, and its substantial formation is clearly established by the evidence. The island was not meandered or surveyed into lots, but the omission is unimportant, as the engineers generally did not survey islands in the Arkansas river; and the title would not be affected if the island had been entirely ignored. Scott v. Lattig, 227 U. S. 229, 33 Sup. Ct. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107; Moss v. Ramey, 239 U. S. 538, 36 Sup. Ct. 183, 60 L. Ed. 425. The definite official survey of the island occurred in 1908.

[3] The allotment is said to be illegal; but, if the tribe acquired title to the island, it concerns only the government and the Indians, and, as no other objection to its validity appears, it should be sustained.

Referring to the deed of 1883, it is certain that the island was included in the description by express recital in the note indorsed on the annexed plat. The authority for including the islands, if not located on the Osage side of the main channel, is sought to be sustained because they constituted lands of the Osage west of the river, for which appropriation was made in favor of the Osages by the Act of March 3, 1883 (22 Stat. 624, c. 143). But there is no showing that they ever claimed such lands; and, furthermore, it seems more than doubtful that islands fall within a description of lands west of the river. In view of the uncertainty existing under the present record as to the force of the deed with respect to the islands, and as title by the deed is not essential to the result and may be presented more fully in other litigation, the question will be left open in this case.

[4] The further basis of title presents a question of fact as to the location of the main channel of the river; that is, which of the two

channels shown to exist on the opposite sides of the island was the main channel when the Osage Tribe acquired title, on June 5, 1872.

A contention advanced by counsel for mineral claimants of the island is that, as the reservation was composed of specified descriptions and acreage, the north meander lines of the river constitute traverse lines limiting the extent of the reservation, and they cite Producers' Oil Co. v. Hanzen, 238 U. S. 325, 35 Sup. Ct. 755, 59 L. Ed. 1330, as authority. But, as that case shows, a meander line is not a boundary, and there is no fact or circumstance in this case tending to establish such limitation.

[5, 6] It was further contended by the same counsel that the act of June 5, 1872, in bounding the reservation by the "main channel" meant simply the "main branch" of the river in the sense of the main Arkansas river. But the terms are not equivalent, as a "channel" of a river is less comprehensive and means primarily its bed, while a "branch" of a river may have two or more separate channels. The act clearly indicates a legislative intention to designate the main or principal channel as a boundary at places where this river had more than one channel, as, for example, where it divided about an island. In such case, the main channel and not the entire channel between the extreme shores was fixed, therefore, as the true boundary. Otherwise, the plain language of the act would not be given effect.

If the boundary had been described merely as the Arkansas river, the division line between the riparian owners would be the middle of the stream; and, if that line had fallen upon the island, a division of the island would be required accordingly. Whitaker v. McBride, 197 U. S. 510, 25 Sup. Ct. 530, 49 L. Ed. 857. But such was not the case, and the location of the main channel on June 5, 1872, must be found in order to determine whether the island was within or without the reservation.

[7] As showing the conditions found by the engineers in 1871–72, the official plat returned to the General Land Office of township 25 north, range 8 east, shows an "isle" at the east line of the section, also the range line, near the north margin of the river, and an arrow, below and slightly to the left, in the middle of the river, pointing downstream. In the field notes is a call on that line from a location below north to the right bank of the river, another north to a half mile corner in the river, and another farther north to the island, shown to be at its north shore; and the width of the island is given.

H. J. Behning, county surveyor of Osage county, who was familiar with the river at that locality, made during his term (1907-1913) a survey, and had prepared maps of the island, river, and adjacent lands with the aid of the previous surveys. He showed by his measurements that at the date of the survey of 1871–72 the south channel was about 75 feet wider than the north channel, and further, by the changing conditions in the channels, including erosions at the north shore of the island and accretions at its south shore, that afterward the north channel had become wider than the south channel. And his opinion was added that the north channel was the minor one at the date of the original survey. There was corroboration in the testi-

mony of two employés on the reservation, who hunted on the island in 1882 and then waded the north channel, finding 15 or 20 steps of shallow water and conditions of willow growth and drift. One of them stated that the south channel was the wider and deeper, contained more water, and was too deep to cross. The other witness gave his estimate that there was more water in the south chanel, but without recalling observation of it at the time.

A traveler who camped near the island at a time of high water in December, 1882, or January, 1883, stated that the island appeared then to split the river in the middle, and on fording below the island found the swifter and deeper water at the north shore; but he did not take particular notice of the north channel, or the width of either. A farmer and stockman who settled at Cleveland early in 1883, and was familiar with the river from that date, described the north channel as being wider, carrying about all the water at low stages, and the south channel as increasing in depth and width from a big rise in 1885, and containing much water when the river was up, but no running water for a considerable part of the year. The testimony of the other witnesses dates from the fall of 1893 and forward, and it confirms the fact that from that year the main channel has been on the north side of the island. In addition, the evidence covers in detail the conditions which have obtained in the river.

The later and present state of the channels does not control, but should have due wieght in connection with the other evidence in arriving at the comparative prominence of the channels in 1872. It is substantially proved that the south channel was the wider and contained the chief flow of water in that year. The fact appears to be consistent with a subsequent change in the extent of the channels in view of the showing of erosion at the north shore of the island and accretion at its south shore, and the characteristics of the two channels. While the proof is not to a certainty desirable, upon the entire evidence a finding is required and will be made that, at the date of the grant of the Osage Reservation to the tribe in 1872, the main channel of this river was on the south side of the island, and in consequence the island then was located within and was a part of that reservation.

A decree will therefore be entered to the effect that the Osage Tribe acquired title to the island in controversy as a part of its reservation; that it was lawfully allotted as surplus land to Larry Nolegs; that the underlying oil, gas, and other minerals are reserved to the tribe and subject to lease and disposal only as provided by the laws of the United States; and that the title of the tribe and allottee and the plaintiff as their trustee to said island and minerals be duly quieted. And further that the defendants and their lessees, grantees, agents, representatives, and successors in interest have no title to or interest in said island or minerals; and that they be perpetually enjoined from asserting the same or interfering with the possession of the island and production of minerals thereon by the plaintiff and said tribe and allottee; and that the costs of this suit be taxed to the defendants.