UNITED STATES v. ROMAINE et al.

(Circuit Court of Appeals, Ninth Circuit. January 6, 1919.)

No. 3153.

1. EVIDENCE ⊜⟿383(9)—MAPS—UNITED STATES COAST SURVEY.
   Hydrographic maps of the United States Coast and Geodetic Survey are entitled to full credence as evidence, and are to be taken as absolutely establishing the truth of all that they purport to show.

2. INDIANS ⊜⟿12—RESERVATION—BOUNDARY—EVIDENCE.
   Evidence *held* to sustain the contention of the government as to the boundary of the Lummi Indian reservation established by treaty in 1855, and later by presidential proclamation, and fixing as a corner the mouth of a river which later changed its position.

3. INDIANS ⊜⟿12—RESERVATIONS—BOUNDARY.
   Whatever may be the general rule of the state or common law as to boundaries of lands on streams or other waters, the government has power to include tidelands in an Indian reservation.

4. INDIANS ⊜⟿11—RESERVATION—TITLE TO LANDS.
   Indians do not acquire title to the lands in a reservation through the treaty of cession, but hold under their original title; such lands being reserved from the cession.

5. INDIANS ⊜⟿12—RESERVATION—ERROR IN SURVEY.
   An error in the survey of an Indian reservation cannot prejudice the rights of the Indians therein.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in equity by the United States against J. W. Romaine and others. Decree for defendants, and complainant appeals. Reversed.

The United States brought suit to quiet the title of the Indians of the Lummi Indian reservation to certain lands alleged to be within the boundaries of the reservation, but which had been sold to the defendants as tidelands by the state of Washington. On January 22, 1855, the United States by treaty with certain Indian tribes, in consideration of their relinquishment of larger tracts of land, set apart to them, among other lands, "the island called Chahchoo-sen, situated in the Lummi river at the point of separation of the mouths emptying respectively into Bellingham Bay and the Gulf of Georgia, all of which tracts shall be set apart, and so far as necessary surveyed and marked out for their exclusive use." 12 Stat. 928. On November 22, 1873, President Grant made proclamation establishing the Lummi Indian reservation in the following terms: "It is hereby ordered that the following tract of country in Washington Territory be withdrawn from sale and set apart for the use and occupation of the Dwamish and other allied tribes of Indians, viz.: Commencing at the eastern mouth of Lummi river; thence up said river to the point where it is intersected by the line between section 7 and 8 of township 38, range 2 east of the Willamette meridian; thence due north on said section line to the township line between townships 38 and 39; thence west along said township line to the low-water mark on the shore of the Gulf of Georgia; then southerly and easterly along the said shore, with the meanders thereof, across the western mouth of Lummi river and around Point Francis; thence northeasterly to the place of beginning—so much thereof as lies south of the West fork of the Lummi river being a part of the island already set

apart by the second article of the treaty with the Dwamish and other allied tribes of Indians made and concluded January 22, 1857."

The controversy involves the question of the true location of the mouth of the East fork of the Lummi river, later called the Nooksack. The appellant contends that the mouth of the river at the time of the treaty was at or near a point marked by a conspicuous rock called by the Indians "Treaty Rock." The appellees contend that the mouth of the river was at a point now marked by two cottonwood trees, nearly opposite the old church, about a mile and a half or two miles westerly from Treaty Rock. Upon the evidence the court below sustained the contention of the appellees and dismissed the bill. From that decree the appeal is taken.

Robert C. Saunders, U. S. Atty., and Ben L. Moore, Asst. U. S. Atty., both of Seattle, Wash.

J. W. Romaine, C. E. Abrams, A. M. Hadley, and W. H. Abbott, all of Bellingham, Wash., for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The appellant introduced in evidence certain hydrographic maps made by the United States Coast and Geodetic Survey, one in 1856 and one in 1887. The court below disregarded these maps, saying, "I do not think that the hydrographic maps are of any weight in this testimony in contradiction to the evidence that is presented"; and, relying upon the testimony of certain white witnesses, the court reached the conclusion that the testimony of the Indian witnesses and the other evidence adduced by the appellant were insufficient to sustain its contention.

[1] We are unable to agree with the trial court as to the effect which should be given to the hydrographic maps of the United States Coast and Geodetic Survey as evidence in this case. We think the maps should be given full credence, and should be taken as absolutely establishing the truth of all that they purport to show. The map of 1856 indicates a large area of tideland at the mouth of the Nooksack river, and the river flowing in an easterly direction past the land which subsequently became the Hedge donation claim. The map of the survey made in 1887 shows the main channel of the river flowing along the south boundary of the Hedge donation claim, and thence easterly and in the direction of Treaty Rock, and, while it shows two or more small streams diverging therefrom and passing through the lands in controversy near the center thereof, it shows that there was no channel or stream whatever at or near the westerly side of the lands. Capt. George R. Campbell, United States engineer and hydrographic surveyor, testified to the accuracy of official hydrographic maps, stating that all the features connecting the shores with the water are accurately outlined and surveyed and tied to permanent landmarks, that these surveys are made with extreme accuracy, and that all are worked on an astronomical basis and are chained and taped a number of times, and that the government is always careful to do as accurate work as is possible on a coast line and in its marine coast survey work. Such testimony was hardly necessary, we think, for the

court might properly take judicial notice of the accuracy of the official plats of the United States Coast and Geodetic Survey.

[2] The evidence shows that in the interval since the date of the treaty the position of the mouth of the river has not always been the same: that from 1855 to 1888 the main channel ran past the cottonwoods and easterly along the south side of the Hedge donation claim, and thence southeasterly to a point near Treaty Rock; that in 1889 the river cut through the south bank near the cottonwoods, and flowed thence into the bay in a southerly direction; that in 1908 the river made a new channel through the low-lying lands of sections 8 and 17, cutting in twain the east half of the Hedge donation land claim, and flowing thence, as it still continues to flow, southeasterly in the old channel of 1855; that during these periods there was a small intermediate channel between the old channel of 1855 and the new channel of 1889, containing in different seasons varying amounts of water, and there is evidence to indicate that 8 or 10 years before 1889 there were times when a quantity of water ran substantially in the line which became the main channel of the years 1889 to 1908.

A. R. Campbell, who was employed by the United States to survey portions of the Lummi Indian reservation in the year 1905, produced a plat of the survey, which was admitted in evidence. He testified, and it is conceded, that at that time the main channel was west of the lands in controversy. His instructions were to survey that portion of the reservation lying east of the main channel of the Nooksack river as it existed at that time, and south of the old channel. The outlines of his map are shown in the following diagram:

Capt. George R. Campbell testified that in 1917, in pursuance of instructions from Washington, he surveyed the northeast boundaries of the Lummi Indian reservation, and the map of his survey was received in evidence. He testified that an old channel, which he marked on the map "1855 to 1888," was traceable on the ground, and that the same was marked by old stumps of trees on the bank. A diagram of the outlines of his map is subjoined:

Several of the Indians of the Lummi reservation testified as to the understanding of the Indians at the time of the treaty, and the position at that time of the eastern mouth of the Nooksack river. George Tsilano, in his 100th year, who was 38 years of age at the time of the treaty, testified that Gov. Stevens, on behalf of the government, pointed out to the Indians the ground which would be given to them, and told them that the eastern side of the reservation would be a line running from Point Francis to Treaty Rock. He testified that it was always understood that the big rock would be the eastern boundary of the reservation, and that the eastern boundary line was from Point Francis to that rock; that he remembered very accurately the location of the mouth of the Nooksack river in 1855, and that it was a little bit above the rock; that there was a well-defined bank on the south bank of the river; that the river was deep, and that there was a large body of land south and west of it, always exposed at high tide. Henry Kavina, an Indian, who was 15 years of age at the time of the treaty, testified that he was present at the making of the treaty, that his father was one of the chiefs who participated in making it, that the easterly boundary line ran from Treaty Rock down to Point Francis, and that the mouth of the river was near Treaty Rock. Albert Descanum,

who was 18 years of age at the time of the treaty, testified that Henry Kavina's father, who was an old chief, and a number of other old men who were at the treaty, all had said that the eastern line of the reservation was from Point Francis out to Treaty Rock; that the mouth of the river was at that time between McDonough's wharf and Treaty Rock, and that it had no other mouth. George Warbes, 15 years old at the time of the treaty, heard Kavina's father and other Indians speak of the eastern boundary of Chah-choo-sen, and they all said that the big rock is where the line would be on the eastern side of the reservation. There were younger Indians who testified as to the same understanding, an understanding which they had received from the old men of the tribe.

George Bremner testified that he came to the reservation in 1880; that at that time the mouth of the river was a little distance above Treaty Rock; that he came again to the reservation in 1893, and found that the river was then flowing on the other side of the land in controversy; that in the year 1908 he went to the reservation to teach; that he knew Henry Kavina's father, the old chief, and many other old men, now dead, who lived on the reservation, and talked with them many times, and had always heard them refer to the mouth of the Nooksack river when the reservation was established as located at Treaty Rock; and that it was the understanding through the treaty negotiations that the eastern line of the reservation was to extend from Point Francis to Treaty Rock. Peter James, an Indian, testified that he began to reside on the reservation in 1886; that he arrived in a canoe, and went past Treaty Rock and McDonough's on to the Indian village; that this was the only river at that time, and that there was no other channel to enter the Nooksack; that he had heard the old people on the reservation talk about the location of the mouth of the river, and that they always placed it near Treaty Rock. Thomas Jefferson, an Indian, testified that he had resided continuously on the reservation since 1874; that the mouth of the river, when he first saw it in that year, was at Allen's place, opposite Treaty Rock. Solomon Balch, an Indian, testified that he first came to the reservation in 1884; that he followed a course up the old channel, and that the mouth of the river was opposite Allen's; that a number of old Indians, now dead, said that the mouth of the old river was out at Treaty Rock, opposite Allen's.

On the part of the appellees a number of white men testified as to the condition of the river at different periods between 1868 and the time of the trial. One witness testified that as early as 1868, when he was 6 years of age, he went up the river, and that there was a channel running down past the cottonwood trees into the bay, and another along the old channel, and that the water went both ways, leaving an island between, and that the same so continued to his knowledge until 1873. Another testified to being on the river in a canoe as early as 1872 or 1873, when he was a boy 11 or 12 years of age, and that his recollection is that he came down the main flow of the river that had the greatest volume of water, past the Indian village and the cottonwoods, and south into the bay. He testified to being on the river in

later years up to 1882, and that the main channel remained the same, although some water continued to flow in the old channel past the Hedge donation claim. Another witness testified that as a deck hand on a steamer he occasionally entered the Nooksack river as early as 1882; that when the tide was out there was very little water in the channel near the Hedge claim; that if the tide was high the boat would enter by that channel, but if it was low it would enter the main channel on the west side of the land in controversy. A woman testified to going up the river by canoe at times in the years 1870, 1872, and up to 1876, and that she entered the river at some point below the church on the reservation, and that she never observed a channel making off to the eastward. Another witness was engaged in occasionally carrying passengers and freight on the river for a period of 4 years, beginning with the year 1870. He testified that the mouth of the river was near the church, but that the other channel was also used. "We would go in first in one channel and then in another. Sometimes one would have greater water than the other, very changeable." Another testified that in 1876 there were two channels, and that he could not say which was the largest or which was most used.

The appellees mainly rely upon the testimony and the map of John M. Snow, who, in the year 1873, under the direction of the surveyor general, surveyed the reservation. The map of the survey omits the land in controversy and fixes the eastern boundary of the reservation along the shore of the channel running south from the cottonwood trees. Snow's contract was to mark the exterior boundaries of the reservation and subdivide all the arable lands into 40-acre tracts. He testified that he was not concerned with anything below the meander line, and that he was not concerned with fixing the mouth of the Nooksack river. He testified that the mouth of the main channel of the river was at that time in the neighborhood of the church. On the map of his survey appear dotted lines surrounding two parcels in the bay at the mouth of the river, which lines, he testified, would indicate mud flats. He denied, however, that he had made the lines, and he testified that he could not explain their presence on the map. The dotted lines suggest the presence of a channel in front of the Hedge claim, and a middle channel, as well as the channel which Snow testified was the main channel in 1873.

The conclusion of the court below was influenced also by an entry in the field notes of the survey of the Hedge donation land claim, made in March, 1861, which tends to indicate that at that time the mouth of the river was at the southwest corner of the Hedge donation claim. It is true that the field notes place the southwest corner of the donation claim "at the mouth of the Lummi river, and doubtless the surveyor was of the opinion that the mouth of the river was at the shoreward boundary of the lands which are in controversy in this suit. He made other field notes, however, which indicate that he considered the old channel, running eastward and along the south front of the Hedge donation claim, a continuation of the Lummi river. Thus in establishing the southeast corner of the claim, which is a mile eastward from the southwest corner, his field notes say:

"This corner is under water at high tide, and is overflowed at times by the river."

Again, in the field notes of a survey of sections 7, 8, 17, and 18, township 38, made by the same surveyor in 1859, he set "meander post on bank of bay or river" for corner to fractions 17 and 18 south of the Hedge donation claim and about midway along its southern boundary.

It is to be observed that in all the evidence produced by the appellees, no information is furnished as to the location of the mouth of the river at any time prior to the year 1868. The appellants, on the other hand, have produced evidence of its position in the year 1855, the year in which the treaty was made. That evidence, uncontradicted and unimpeached, and sustained as it is by the hydrographic maps which the court below, erroneously as we think, discredited, together with the proof of the general understanding of the Indians that the treaty fixed the eastern line of their reservation on a line running from Point Francis to Treaty Rock, is sufficient to sustain the contention of the appellant that the eastern mouth of the river was in 1855 at or near Treaty Rock.

[3] The appellees invoke the rule that grants by the government of public lands bounded on streams or other waters without reservation or restriction are to be construed in accordance with the laws of the state if the land lies within a state, or in accordance with the common law if it lies within a territory, and contend that a reservation to Indians of land on tidewater in Washington Territory is presumed to extend to high-water mark only. But it is not disputed that the government had the power to grant for Indian reservations or for other purposes lands to low-water mark. In Shively v. Bowlby, 152 U. S. 1, 48, 14 Sup. Ct. 548, 566 (38 L. Ed. 331), the court said:

"We cannot doubt, therefore, that Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States holds the territory."

In Heckman v. Sutter, 119 Fed. 83, 55 C. C. A. 635, this court said:

"The prohibition contained in the act of 1884 against the disturbance of the use or possession of any Indian or other person of any land in Alaska claimed by them is sufficiently general and comprehensive to include tidelands as well as lands above high-water mark. * * * The fact that at that time the Indians and other occupants of the country largely made their living by fishing was no doubt well known to the legislative branch of the government."

The intention to reserve to the Indians the possession of the land to low-water mark is made evident by the terms of the proclamation, for one of the courses on the west side of the island runs "to the low-water mark on the shore of the Gulf of Georgia, then southerly and easterly along the said shore with the meanders thereof, across the western mouth of Lummi river, and around Point Francis." The next course is "thence northeasterly to the place of beginning." There

was no occasion to mention low-water mark on the east side of the island, for if, as we have found, the place of beginning was in fact at Treaty Rock, the last line of the description includes within the boundaries all the lands here in controversy.

[4] It is not to be supposed that in making the treaty the government intended to take from the Indians any of the rights they had theretofore enjoyed in the island of Chah-choo-sen. In Gaines v. Nicholson, 9 How. 356, 364 (13 L. Ed. 172), the court said of the Indians' right of occupancy in such a reservation:

"It was so much carved out of the territory ceded, and remained to the Indian occupant, as he had never parted with it. He holds, strictly speaking, not under the treaty of cession, but under his original title, confirmed by the Government in the act of agreeing to the reservation."

In United States v. Winans, 198 U. S. 371, 383, 25 Sup. Ct. 662, 49 L. Ed. 1089, the court held that the right of taking fish in the Columbia river and the right of erecting temporary buildings for curing them, reserved to the Yakima Indians by treaty, was not a grant of right to the Indians, but a reservation by them of rights already possessed and not granted away by them. In the Enabling Act, by which the territory of Washington was admitted into the Union (Act Feb. 22, 1889, c. 180, § 4, 25 Stat. 676), the people of the newly created state were required to agree and declare that they forever disclaim all right and title—

"to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States."

[5] We are unable to assent to the proposition that, because article 7 of the treaty reserves to the President at his discretion the power thereafter to remove the Indians from the reservation, the official survey of 1873 was in effect a removal of the Indians from the lands in controversy. The power to survey the lands so reserved in the treaty was the power to cause the whole or any portion of the reserved lands to be surveyed into lots, and to assign the same to individuals or families for permanent homes. The land in controversy was not adapted to such individual use, and there was no occasion to survey it, or to take from the Indians on the reservation the common right to use it for the purposes of fishing and digging shellfish, or other purposes, and the surveyor general, in causing the survey to be made, had no authority to exclude any of the reserved lands from the boundaries of the reservation. The error in failing to extend the survey so as to include the lands in controversy cannot prejudice the rights of the Indians. Moss v. Ramey, 239 U. S. 538, 36 Sup. Ct. 183, 60 L. Ed. 425; Scott v. Lattig, 227 U. S. 229, 33 Sup. Ct. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107; United States v. Hutchings (D. C.) 252 Fed. 841.

The decree is reversed, and the cause is remanded, with instructions to enter a decree as prayed for in the appellant's bill.