**UNITED STATES of America, Plaintiff, and**

**Lummi Indian Tribe, Intervenor–Appellant,**

v.

**STATE OF WASHINGTON, Defendant–Appellee.**

**No. 90–35887.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1991.

Decided June 30, 1992.

Harry L. Johnsen, Office of Reservation Atty., Bellingham, Wash., for intervenor-appellant.

Phillip E. Katzen, Evergreen Legal Services, Mason D. Morisset, Pirtle, Morisset,

Schlosser & Ayer, Seattle, Wash., Annette M. Klapstein, Tacoma, Wash., Alvin Ziontz, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Wash., John Sledd, Suquamish, Wash., for additional Indian tribes.

Robert K. Costello and Jay D. Geck, Asst. Attys. Gen., Olympia, Wash., for defendant-appellee.

Ronald Friedman, Asst. U.S. Atty., Seattle, Wash., Apphia T. Schley, U.S. Dept. of Justice, Washington, D.C., for amicus curiae.

Before: WRIGHT, HUG and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

## FACTS

This interlocutory appeal is about the location of the eastern boundary of the Lummi Indian Reservation in the State of Washington. The State of Washington contends that the eastern boundary of the reservation is the line of low tide on the eastern side of the peninsula that contains the Lummi Reservation. The Lummi Indians contend that the eastern boundary is a straight line from Point Francis to Treaty Rock because that is what Governor Stevens represented to them in 1855 at the Treaty of Point Elliott[1] and because the Executive Order of 1873 is ambiguous. According to the Lummi, the reservation includes the waters of Bellingham Bay west of that line.

This controversy arises in the context of continuing efforts to allocate the fish resources of the northwest United States between Indians and non-Indians: in this instance, the fish in the waters of Bellingham Bay. The court could not rule on the prop-

---

1. The Treaty of Point Elliott is part of the Stevens treaties, which established the rights of certain Pacific Northwest Indians to take fish. The treaties were negotiated by Isaac Stevens, the Governor of Washington Territory and Superintendent of Indian Affairs, between the United States and the Indians in the 1850's. *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 666–69, 674–79, 99 S.Ct. 3055, 3064–66, 3068–71, 61 L.Ed.2d 823 (1979).

er allocation of fish until it decided whether, according to an Executive Order of 1873, part of Bellingham Bay is included in the Lummi Indian Reservation. If so, the Lummi Indians would have an exclusive right to fish within the boundaries of their reservation. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 683–84, 99 S.Ct. 3055, 3073–74, 61 L.Ed.2d 823 (1978).

After an evidentiary hearing on the issue of the boundary, the magistrate judge made findings and recommendations in favor of the state. The Lummi, other Indian tribes, and the United States objected to the magistrate judge's findings of fact and conclusions of law. After hearing the objections and considering the record, the district court decided in favor of the state. The Lummi Indian Tribe moved for an order certifying the decision for immediate appeal pursuant to 28 U.S.C. § 1292(b). The court granted the motion, finding "that the Decision and Order re Eastern Boundary of the Lummi Indian Reservation involves a controlling question of law as to which there is a substantial ground for difference of opinion[.]"

At issue is the interpretation of an executive order of November 22, 1873, by President Grant, which provided a legal description of the boundaries of the Lummi Reservation. The handwritten version of the Executive Order reads:

Executive Mansion
November 22 1873

It is hereby ordered that the following tract of country in Washington Territory be withdrawn from sale and set apart for the use and occupation of the Dwamish and other allied tribes of Indians, viz.:

Commencing at the eastern mouth of Lummi River thence up said river to the point where it is intersected by the line between sections seven and eight of township thirty eight north range two east of the Willamette meridian thence due north on said section line to the township line between townships thirty eight and thirty nine thence west along said township line to the low-water mark on the shore of the Gulf of Georgia thence southerly and easterly along the said shore with the meanders thereof across the western mouth of Lummi river and around Point Francis thence northeasterly to the place of beginning—so much thereof as lies south of the west Fork of the Lummi river being a part of the island already set apart by the second article of the treaty with the Dwamish and other allied tribes of Indians made and concluded January 22, 1857 [sic] [Stats at. Large Vol. 12. p. 928]

U.S. Grant.

After reviewing evidence from both parties supporting their differing interpretations of "and around Point Francis thence northeasterly to the place of beginning," which describes the reservation's eastern boundary, the district court decided that the State of Washington was correct: "the eastern boundary of the reservation follows the low water mark, just as the western boundary does."

## ANALYSIS

### *Standard of Review*

Treaty interpretation is a mixed question of law and fact. *United States v. Lummi Indian Tribe*, 841 F.2d 317, 319 (9th Cir. 1988). We review de novo the interpretation and application of a treaty. *Dillon v. United States*, 792 F.2d 849, 852 (9th Cir. 1986), *cert. denied*, 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987).[2] Where an

---

2. The parties cite *United States v. Washington*, 730 F.2d 1314, 1317–1318 (9th Cir.1984) for the standard of review, which they claim is "clearly erroneous." However, that case did not involve the interpretation of a treaty or of an executive order pursuant to a treaty. It dealt instead exclusively with evidence ("historical facts") presented to determine where the Makah Indian Tribes' "usual and accustomed fishing grounds and stations" under the 1855 Stevens treaty were located. At the time the Makah case

arose, the 1855 treaty reference to "usual and accustomed grounds and stations" had already been interpreted. *United States v. Lummi Indian Tribe*, 841 F.2d 317, 318 (9th Cir.1988) (quoting *United States v. Washington*, 384 F.Supp. 312, 332 (W.D.Wash.1974) (the Boldt decision)).

Here, in contrast, we must interpret the Executive Order and its phrase "and around Point Francis thence northeasterly to the place of beginning[.]" Thus *United States v. Washington,*

executive order relates to a reservation set aside by treaty, the review is also de novo. *Cf. Puyallup Indian Tribe v. Port of Tacoma,* 717 F.2d 1251, 1257 n. 6 (1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984).

We may affirm "on any basis supported by the record even if the district court did not rely on that basis." *See Shaw v. California Dep't of Alcoholic Beverage Control,* 788 F.2d 600, 603 (9th Cir.1986) (reviewing a dismissal for failure to state a claim).

### Construction of Indian Treaties and Executive Orders

■ The rule has long been that "treaties with the Indians must be interpreted as they would have understood them, ... and any doubtful expressions in them should be resolved in the Indians' favor." *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970); *Puyallup Indian Tribe,* 717 F.2d at 1257 (quoting *Choctaw*). We have stated that the rule applies to executive orders no less than treaties. *Puyallup Indian Tribe,* 717 F.2d at 1257 n. 6; *Moore v. United States,* 157 F.2d 760, 762 (9th Cir.1946), *cert. denied,* 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277 (1947); *United States v. Walker River Irrigation Dist.,* 104 F.2d 334, 337 (9th Cir.1939).

### *The District Court's Decision*

■ The district court found that the 1873 Executive Order was ambiguous in describing the eastern boundary of the Lummi Reservation. The court resolved the ambiguity it found in favor of the state:

> [T]he fact that the legal description in the Executive Order is ambigious [sic] does not *ipso facto* entitle the Lummis to the most favorable conceivable interpretation when all of the other evidence strongly supports the selection of the low water mark as the eastern boundary.

Although the district court's decision was reached after hearing evidence, we find no ambiguity in the Executive Order. In addi-

730 F.2d 1314, does not provide the standard of

tion to stating "and around Point Francis thence northeasterly to the place of beginning" the Executive Order states immediately thereafter "—so much thereof as lies south of the west Fork of the Lummi river being a part of the island already set apart by the second article of the treaty with the Dwamish and other allied tribes of Indians made and concluded January 22, 1857 [sic] [Stats at. Large Vol. 12 p. 928]."

The latter statement in the Executive Order means that south of the west fork of the Lummi River, the boundaries are to follow those set forth in the treaty. The Executive Order makes clear that the line of low water marks the actual boundary. The treaty says nothing about a straight line boundary from Point Francis to Treaty Rock. Instead, Article II of the Treaty of Point Elliott (Muckl-te-oh, or Mukilteo), dated January 22, 1855, 12 Stat. 927 (1859) states in relevant part:

> There is, however, reserved for the present use and occupation of the said tribes and bands the following *tracts of land,* viz: ... the *island* called Chah-choo-sen, situated in the Lummi River at the point of separation of the mouths emptying respectively into Bellingham Bay and the Gulf of Georgia.

United States Statutes at Large, 36–37th Congress, 1859–63, Vol. 12, at 928 (emphasis added). The Executive Order specifically incorporates the provision of the Treaty reserving the island and does nothing more than to specify that the boundary around the island "already set apart" shall follow the low water mark. We think this intent is clear from the statement in the Executive Order that the low water mark shall be followed on the shore of the Gulf of Georgia "southerly and easterly along the said shore with the meanders thereof across the western mouth of Lummi river *and* around Point Francis thence northeasterly to the place of beginning." (Emphasis added).

This interpretation comports with the fact that the Executive Order of 1873 was designed to add land to the reservation to the north of the island of Chah-choo-sen. Therefore, the Executive Order describes

review.

the land added to the north specifically and in detail. The description mentions Point Francis in order to include the land known as Portage Island within the reservation boundaries. Once the boundary line has been set around Point Francis to include Portage Island, the Executive Order does not need to be specific because by its terms it is merely describing the remainder of the island already designated for the Lummi in the treaty.

### The Romaine Decision

In *United States v. Romaine*, 255 F. 253 (9th Cir.1919), we had to decide the location of "the point of beginning" referred to in the 1873 Executive Order on the eastern boundary of the Lummi Reservation. The dispute in *Romaine* arose when

> The United States brought suit to quiet the title of the Indians of the Lummi Indian reservation to certain lands alleged to be within the boundaries of the reservation, but which had been sold to the defendants as tidelands by the state of Washington.

*Id.* at 253. The court quoted the language of the Treaty of Point Elliott and the 1873 Executive Order, *id.* at 253–54, and said:

> The controversy involves the question of the true location of the mouth of the East fork of the Lummi river, later called the Nooksack. The appellant [the Lummi tribe] contends that the mouth of the river at the time of the treaty was at or near a point marked by a conspicuous rock called by the Indians "Treaty Rock." The appellees [the non-Indian settlers] contend that the mouth of the river was at a point now marked by two cottonwood trees, nearly opposite the old church, about a mile and a half or two miles westerly from Treaty Rock.

*Id.* at 254.

For two reasons, this court reversed the district court's decision in favor of the appellees, who were the non-Indian purchasers of the tidelands in question. First, we found that hydrographic maps [3] prepared by the United States Coast and Geodetic Survey "should be taken as absolutely establishing the truth of all that they purport to show." *Id.* These maps showed the mouth of the Lummi, or Nooksack River, near the location of Treaty Rock. *Id.* They did not show any river mouth to the west of Treaty Rock.[4]

Second, we accepted the testimony of several Lummi Indians, including one 100–year–old, George Tsilano. Tsilano was 38 years old at the time of the 1855 treaty, and he testified, along with other Lummi who were present at the treaty negotiations, that "the eastern boundary line was from Point Francis to [Treaty Rock]." *Id.* at 256.

In concluding that the eastern mouth of the Lummi River had been near Treaty Rock in 1855, we stated:

> It is to be observed that in all the evidence produced by the appellees, no information is furnished as to the location of the mouth of the river at any time prior to the year 1868. The appellants, on the other hand, have produced evidence of its position in the year 1855, the year in which the treaty was made. That evidence, uncontradicted and unimpeached, and sustained as it is by the hydrographic maps which the court below, erroneously as we think, discredited, together with *the proof of the general understanding of the Indians that the treaty fixed the eastern line of their reservation on a line running from Point Francis to Treaty Rock*, is sufficient to sustain the contention of the appellant that the eastern mouth of the river was in 1855 at or near Treaty Rock.

*Id.* at 259 (emphasis added).

The appellees in *Romaine* had also argued that a reservation to Indians of land

---

**3.** Hydrography is the determination of depths of water. Reporter's Transcript of August 3, 1987 (RT 1), at 26–27.

**4.** The evidence showed that in 1889, the river cut through its south bank near the cottonwoods and flowed south, instead of east, into

Bellingham Bay. *Romaine*, 255 F. at 253. This change accounted for the difference in the location of the eastern mouth of the river, and for the different interpretations of the Executive Order.

on tidewater in Washington Territory was presumed to extend only to the high-water mark. *Id.* We responded:

> The intention to reserve to the Indians the possession of the land to low-water mark is made evident by the terms of the [1873 Executive Order], for one of the courses on the west side of the island runs 'to the low-water mark on the shore of the Gulf of Georgia, then southerly and easterly along the said shore with the meanders thereof, across the western mouth of Lummi river, and around Point Francis.' The next course is 'thence northeasterly to the place of beginning.' *There was no occasion to mention low-water mark on the east side of the island, for if, as we have found, the place of beginning was in fact at Treaty Rock, the last line of the description includes within the boundaries all the lands here in controversy.*

*Id.* at 259–60 (emphasis added).

*Romaine,* however, is not precedent for this case, because the issues there were the ownership of tidelands on a portion of the eastern boundary and where the place of beginning referred to in the Executive Order was in 1855, not the location of the entire eastern boundary. Consequently, *Romaine* does not discuss what the incorporation of the second article of the treaty meant in the Executive Order ·because there was no need to resolve that issue. The district court correctly observed that "While the [*Romaine*] court referred to the testimony of tribal members that Governor Stevens had indicated a straight line boundary, 255 F. at 256–257, 259–260, *this issue was not necessary to the decision* and the Ninth Circuit did not resolve it." (Emphasis added.) Until today, we have not resolved the question of the entire eastern boundary from Point Francis to Treaty Rock.

Although we do so on other grounds, the decision of the district court · is AFFIRMED.