**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE MINISTRY OF DEFENSE AND SUPPORT FOR THE ARMED FORCES OF THE ISLAMIC REPUBLIC OF IRAN, as Successor in Interest to the Ministry of War of the Government of Iran, *Petitioner-Appellant*, | No. 13-57182 <br><br> D.C. No. 3:98-CV-01165-B-DHB |
| v. | OPINION |
| RENAY FRYM; STUART E. HERSH; ABRAHAM MENDELSON; DANIEL J. MILLER; FRANCE MOKHATEB RAFII; ELENA ROZENMAN; NOAM ROZENMAN; TZVI ROZENMAN; DEBORAH RUBIN; JENNY RUBIN, *Claimants-Appellees*, <br><br> and <br><br> CUBIC DEFENSE SYSTEMS, INC., as Successor in Interest to Cubic International Sales Corporation, *Respondent*. | |

Appeal from the United States District Court
for the Southern District of California
Barry Ted Moskowitz, Chief District Judge, Presiding

Argued and Submitted
February 2, 2016—Pasadena, California

Filed February 26, 2016

Before: Dorothy W. Nelson, Consuelo M. Callahan,
and N. Randy Smith, Circuit Judges.

Opinion by Judge D.W. Nelson

## SUMMARY[*]

### Attachment of Judgments

The panel affirmed the district court's grant of lien claimants' motion to attach a judgment that the Ministry of Defense of Iran obtained in an underlying arbitration with an American company.

The lien claimants moved to attach the judgment, known as the "Cubic Judgment," in order to collect on judgments they hold against the Islamic Republic of Iran for their injuries arising out of terrorism sponsored by Iran.

The panel held that the Algiers Accords, by which the United States and Iran resolved the Iranian Hostage Crisis, did not prevent the lien claimants from attaching the Cubic Judgment. The panel also held that the Cubic Judgment was a blocked asset pursuant to President Obama's 2012

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Executive Order No. 13359, subject to attachment and execution under the Terrorism Risk Insurance Act.

## COUNSEL

Steven W. Kerekes (argued), Pasadena, California, for Petitioner-Appellant.

Jonathan R. Mook (argued), DimuroGinsberg, P.C., Alexandria, Virginia; Philip J. Hirschkop, Hirschkop & Associates, Lorton, Virginia, for Claimant-Appellee France M. Rafii.

David J. Strachman (argued), McIntyre Tate LLP, Providence, Rhode Island, for Claimants-Appellees Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart E. Hersh, Renay Frym, Noam Rozenman, Elena Rozenman, and Tzvi Rozenman.

Stuart F. Delery, Assistant Attorney General; Laura E. Duffy, United States Attorney; Sharon Swingle and Benjamin M. Schultz (argued), Attorneys, Appellate Staff Civil Division, United States Department of Justice; Lisa. J. Grosh, Assistant Legal Advisor, Department of State; Bradley T. Smith, Chief Counsel, Office of Foreign Assets Control, Department of the Treasury, Washington D.C, for Amicus Curiae United States.

## OPINION

D.W. NELSON, Senior Circuit Judge:

This case involves an attempt by ten American citizens (hereinafter Lien Claimants) to collect on valid judgments they hold against the Islamic Republic of Iran (Iran) for their injuries arising out of terrorism sponsored by Iran. The Lien Claimants seek to attach a $2.8 million judgment[1] that the Ministry of Defense of Iran (the Ministry) obtained in an underlying arbitration with an American company, Cubic Defense Systems, Inc (Cubic).

The district court granted Lien Claimants' motion to attach the Cubic Judgment. The Ministry timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.[2]

---

[1] With accrued interest and the addition of attorneys' fees, over $9.4 million is available. We refer to the underlying judgment as the "Cubic Judgment."

[2] The district court stayed disbursement of funds to Lien Claimants pending the outcome of the Ministry's appeal. At oral argument, the Ministry requested that this Court maintain the stay of disbursement pending the Ministry's petition for certiorari to the Supreme Court. We decline the Ministry's request. The Ministry has not shown "both a probability of success on the merits and the possibility of irreparable injury," or "that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Cf. Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983).

## I. Background

Like all foreign states, Iran is protected by sovereign immunity. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("A foreign state is presumptively immune from suit in United States' courts."). Absent an exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–1611, a foreign state cannot be sued nor can its assets be attached to satisfy a judgment.[3] *Saudi Arabia*, 507 U.S. at 355. One such exception is for claims arising out of state-sponsored terrorism. 28 U.S.C. § 1605A.

The Lien Claimants hold judgments against Iran based on terrorist activity that Iran sponsored.

Claimant France M. Rafii's father, Dr. Shapoir Bakhtiar, was a former prime minister of Iran. In 1991, Iranian agents murdered Dr. Bakhtiar in his home in Paris, France, because of his political opposition to the Islamic regime. In 2001, Rafii sued Iran under the state-sponsored terrorism exception to the FSIA. Iran did not appear. The district court conducted a two-day bench trial and entered default judgment against Iran for $5 million in compensatory damages (after making the necessary factual, jurisdictional, and statutory findings). The Ministry does not dispute the validity of the judgment.

---

[3] The Ministry of Defense is an inseparable part of the Republic of Iran, and it therefore qualifies as a "foreign state" within the meaning of the FSIA. *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 495 F.3d 1024, 1034–36 (9th Cir. 2007), *rev'd on other grounds sub nom. Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009).

In 1997, Hamas detonated a suicide bomb at a pedestrian mall in Jerusalem, injuring many American citizens. The Rubin Claimants are a group of nine individuals who either were themselves injured in the bombing, or whose relatives were injured. In 2001, the Rubin Claimants sued Iran for its part in the bombing under the state-sponsored terrorism exception to the FSIA. Iran did not appear. The district court conducted a four-day evidentiary hearing and concluded that Iran provided terrorist training and other material assistance to the bombers. After evaluating all of the Rubin Claimants' compensatory damages, based on each plaintiff's injuries, the district court entered default judgment against Iran and ordered Iran to pay the damages ranging from $2.5 million to $15 million. The Ministry does not dispute the validity of the judgment.

Despite these valid judgments against Iran, Lien Claimants initially lacked any means to collect because the state-sponsored terrorism exception to the FSIA created an anomaly. While the exception abrogated a foreign sovereign's immunity from judgment, it left in place the foreign sovereign's immunity from attachment of its assets.

In 2002, Congress addressed this problem, enacting the Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107–297, § 201, 116 Stat. 2322, 2337 (codified in relevant part at 28 U.S.C. § 1610 note). As originally enacted, section 201(a) provides:

> Notwithstanding any other provision of law . . . , in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune

under [28 U.S.C. § 1605(a)(7) (2000)], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent any compensatory damages for which such terrorist party has been adjudged liable.

"Blocked" assets include assets "seized or frozen by the United States" under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706. *See* TRIA § 201(d)(2). The TRIA therefore permits attachment when it might have otherwise been barred by the FSIA.[4]

In 1977, Cubic agreed to sell the Ministry an air combat maneuvering range system (ACMR) for $17 million. Additionally, under a separate service contract, Cubic agreed to maintain the ACMR for Iran. By October 1978, Iran had paid over $12 million of the purchase price and modest sums on the service contract. By February 1979, Cubic obtained export permits and was poised to transfer the equipment to Iran.

---

[4] Congress amended the FSIA as part of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110–181, 122 Stat. 3 (2008). Specifically, Congress replaced the terrorism exception to sovereign immunity that had been codified at 28 U.S.C. § 1605(a)(7) with a new terrorism exception codified at 28 U.S.C. § 1605A. The new exception provides an explicit private right of action for U.S. citizens injured by state sponsors of terrorism. In addition, Congress created a special attachment provision for plaintiffs holding a Section 1605A judgment against a foreign state. *See* 28 U.S.C. §1610(g).

But, by November 1979, the Iranian revolution had disrupted relations between Iran and the United States. The revolution permanently prevented full performance of the sales and maintenance contracts. Iran and Cubic eventually entered into a modified agreement, under which Cubic would attempt to sell the ACMR to another country. Depending on the result of Cubic's attempt to resell the ACMR, either Iran would be entitled to partial reimbursement for payments it made to Cubic, or Cubic would be entitled to additional payment from Iran.

In the Fall of 1982, Cubic sold the equipment to Canada but ignored Iran's requests for an accounting.

In 1991, pursuant to its contracts with Cubic, Iran initiated arbitration proceedings with the International Chamber of Commerce (ICC). In 1997, the ICC found that Iran and Cubic agreed to discontinue the acquisition and maintenance contracts in light of the revolution, and that they had reached a modified agreement permitting Cubic to sell the equipment to another country. The ICC held that Cubic owed Iran $2.8 million plus interest and costs.

In 1998, the Ministry filed a petition to confirm the arbitration award. The U.S. District Court for the Southern District of California confirmed the award. It entered the Cubic Judgment in August 1999. After the final resolution of this dispute, Cubic deposited funds covering the Cubic Judgment with the Southern District of California.

The Lien Claimants moved to attach the Cubic Judgment. The Ministry opposed Lien Claimants' attempts, arguing: (1) that the Algiers Accords, by which the United States and Iran resolved the Iranian Hostage Crisis, required the United

States to protect the Cubic Judgment from attachment; and (2) that the Cubic Judgment was in any event not attachable under the TRIA or any other statute.

The district court granted Lien Claimants' motion to attach. It held that allowing attachment would not violate the United States' obligations under the Algiers Accords because the United States committed only to restore Iran to its pre-November 1979 position. As of 1979, the district court explained, Iran did not have an interest in the confirmed arbitration award.

The district court further held that the Cubic Judgment was a "blocked asset" within the meaning of the TRIA. The court reasoned that the Cubic Judgment was blocked pursuant to President Obama's 2012 Executive Order No. 13359, as well as pursuant to President Bush's 2005 Executive Order No. 13382. It therefore found that the Cubic Judgment was subject to attachment under the TRIA.

In the alternative, the district court held that the Rubin Claimants could attach the Cubic Judgment under 28 U.S.C. § 1610(g), the special attachment provision of the FSIA for creditors holding a Section 1605A terrorism-related judgment against a foreign state.

## II. Standard of Review

We review the district court's interpretation of treaties, statutes, regulations, and executive orders de novo. *See Motorola, Inc. v. Fed. Express Corp.*, 308 F.3d 995, 999, n.5 (9th Cir. 2002) (treaties); *City of Los Angeles v. United States Dep't of Commerce*, 307 F.3d 859, 868 (9th Cir. 2002) (statutes); *United States v. Willfong*, 274 F.3d 1297, 1300 (9th

Cir. 2001) (regulations); *United States v. Washington*, 969 F.2d 752, 754–55 (9th Cir. 1992) (executive orders).

## III.     *Discussion*

We hold that the United States does not violate its obligations under the Algiers Accords by permitting Lien Claimants to attach the Cubic Judgment.  We also hold that the Cubic Judgment is a blocked asset pursuant to President Obama's 2012 Executive Order No. 13359 subject to attachment and execution under the TRIA.

Because it is not necessary to our decision, we do not address whether the Cubic Judgment is also a blocked asset pursuant to President Bush's 2005 Executive Order No. 13382.  Similarly, we decline to address the district court's alternative holding that the Rubin Claimants can attach the Cubic Judgment under 28 U.S.C. § 1610(g).

### 1.   **Permitting Lien Claimants to attach the Cubic Judgment does not violate the United States' obligations under the Algiers Accords.**

The Algiers Accords do not prevent Lien Claimants from attaching the Cubic Judgment because the Ministry's interest in the Cubic Judgment did not arise until after November 14, 1979.  As the Supreme Court specifically held in *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, the appropriate property interest to consider is Iran's interest in the Cubic Judgment, which did not arise until 1998.  556 U.S. 366, 376–77 (2009).

In November 1979, Iran took hostages at the American Embassy in Tehran.  Invoking the International Emergency

Economic Powers Act (IEEPA), President Carter responded by issuing Executive Order 12170, which "blocked all property and interests in property of the Government of Iran." Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979).[5]

The Department of Treasury promulgated the Iranian Assets Control Regulations to execute President Carter's Executive Order. 31 C.F.R. pt. 535, 44 Fed. Reg. 65279–01 (Nov. 15, 1979). The Regulations provide that "[n]o property subject to the jurisdiction of the United States or which is in the possession or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, or withdrawn or otherwise dealt in except as authorized." 31 C.F.R. § 535.201 (2013). The freeze took effect on November 14, 1979.

On January 19, 1981, the United States and Iran settled the hostage crisis and entered into the Algiers Accords. The United States agreed to "restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979." The purpose of the Algiers Accords was to return Iran to the position it was in before President Carter froze Iran's assets in response to the taking of hostages at the American Embassy.

In essence, the Ministry argues that based on a number of factors—most importantly, $12 million in payments Iran made to Cubic on the $17 million sales contract—Iran had a

---

[5] Under the IEEPA, the President can impose economic sanctions to respond to "unusual and extraordinary" international threats. 50 U.S.C. §§ 1701, 1702(a). These sanctions are administered by the Treasury Department's Office of Foreign Assets Control (OFAC).

property interest in the *ACMR* before November 14, 1979. Therefore, according to the Ministry, for the United States to honor its commitments under the Algiers Accords, it must protect the *Cubic Judgment* from attachment.

But, under the Supreme Court's decision in *Elahi*, when Iran gained a property interest in the ACMR is irrelevant to our inquiry.

*Elahi* involved an attempt by a different lien claimant to attach the Cubic Judgment under the TRIA.[6] The Supreme Court rejected this Court's determination that the ACMR was the relevant asset at issue. In so holding, the Court explained that the lien claimants in that case did not seek to attach the ACMR, but instead tried to attach the "judgment enforcing [the] arbitration award based upon Cubic's failure to account to Iran for Iran's share of the proceeds of that system's sale." *Elahi*, 556 U.S. at 376. The Court explained that Iran's interest in the Cubic Judgment did not arise until 1998, when the district court confirmed the arbitration award. *Id.*

Further, the Supreme Court explained, even Iran's property interest underlying the Cubic Judgment—the proceeds from the sale to Canada—did not arise until October 1982 at the earliest. Only after Cubic sold the equipment could it "reasonably, comprehensively, and precisely account" for the result of its resale attempts. *Id.* at 376–77 (internal quotations omitted).

---

[6] We note that, before the Supreme Court in *Elahi*, the Ministry made a contrary argument to the one it makes here. There, the Ministry asserted that Iran's interest in the Cubic Judgment could not be "backdated" to 1981.

Under *Elahi*, Iran did not have an interest in the Cubic Judgment or in the property underlying the judgment until well after the Algiers Accords were consummated. Permitting Lien Claimants to attach the Cubic Judgment would therefore not cause the United States to run afoul of its obligations under the Algiers Accords.[7]

## 2. The Cubic Judgment is a blocked asset subject to attachment and execution under the TRIA.

The Cubic Judgment is a "blocked asset" pursuant to President Obama's 2012 Executive Order No. 13539. It is therefore subject to attachment and execution pursuant to the TRIA.

In 2012, President Obama invoked the IEEPA to block "[a]ll property and interests in property of the Government of Iran . . . that are in the United States."[8] Exec. Order No. 13359, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012). However,

---

[7] The United States agrees with this conclusion. In its amicus brief, the United States contends that its "longstanding position . . . is that the [Algiers Accords] simply required the United States to return, as directed by Iran, specified Iranian properties that were in existence and subject to jurisdiction as of January 19, 1981 (the date of the Accords). The United States has no transfer obligation with respect to property that Iran acquired after the date of the Accords." Brief of the United States as Amicus Curiae at 18–19. The government's interpretation of its own agreement is entitled to "great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 & n.10 (1982).

[8] This Court has already found that the Ministry is "an inherent part of the state of Iran." *Ministry of Defense*, 495 F.3d at 1036, *rev'd on other grounds by Elahi*, 556 U.S. 366 (2009). Therefore, the Ministry's ownership of the Cubic Judgment—rather than Iran's—does not foreclose the application of President Obama's blocking order.

President Obama's blocking order exempted Iranian property and interests in property that had been blocked in 1979, and that were then unblocked in 1981. 77 Fed. Reg. at 6660.

The Ministry argues that Iran held a property interest in the ACMR that was blocked in 1979 then unblocked in 1981. The Ministry therefore contends that the Cubic Judgment falls within the exemption to President Obama's 2012 Executive Order.

We reject this argument, which just like the Ministry's argument that the Algiers Accords prevent attachment, relies on misidentifying the asset actually at issue in this case.

Under *Elahi*, the key asset is the one the Lien Claimants seek to attach: the Cubic Judgment, not the ACMR as the Ministry now argues. And the Cubic Judgment does not fall within the exemption to President Obama's blocking order. Iran did not gain a property interest in the Cubic Judgment until 1998, when the district court confirmed the underlying arbitration award. *Elahi*, 556 U.S. at 376. Accordingly, Iran's property interest in the Cubic Judgment existed neither in 1979, when Iran's assets were blocked, nor in 1981 when those assets were unblocked. Whether and when Iran gained

a property interest in the ACMR is simply not relevant to this case.[9]

**AFFIRMED.**

---

[9] The Ministry's contention that 31 C.F.R. § 535.540(f) governed the proceeds of Cubic's sale to Canada is irrelevant for the same reason. The relevant asset is not the proceeds of the sale, but rather the judgment confirming the arbitral award. *Elahi*, 556 U.S. at 376. Even if it were relevant, the district court correctly found that Section 535.540(f) would not apply. The regulation only requires sale proceeds to be transferred to Iran when the sale of otherwise blocked property is made pursuant to a specific type of OFAC license. The ACMR was not blocked after January 1981, and there is no evidence that Cubic's sale of the ACMR involved any such license.